**WESTMINSTER INVESTING CORPO-
RATION, Appellant**

v.

**The EQUITABLE ASSURANCE SOCI-
ETY OF the UNITED STATES.**

**No. 23440.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 24, 1970.

Decided Nov. 20, 1970.

**654**

Mr. Daniel Webster Coon, Washington, D. C., with whom Mr. Edmund D. Campbell, Washington, D. C., was on the brief, for appellant.

Mr. Allan I. Mendelsohn, Washington, D. C., with whom Mr. Henry H. Glassie, Washington, D. C., was on the brief, for appellee.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

In this case the appellant borrower seeks to recover $39,679.17 in unearned interest it paid to the lender as part of the prepayment of a note secured by a deed of trust. By the terms of the note, prepayment was permitted on any regular quarterly date specified in the note for the payment of blended installments of principal and interest. The unearned interest claim arises out of the fact that the lender required the borrower to pay interest to the next regular payment date before it would accept prepayment of the entire indebtedness in the interim between the regular payment dates. We decide that the lender was within his

rights in so doing and affirm the decision of the District Court.

Appellant, Westminster Investing Corporation (Westminster) has owned a piece of real property known as "Seven Corners" in Fairfax County, Virginia, since March of 1963. Westminster acquired the property subject to a first deed of trust held by the appellee. Equitable Life Assurance Society (Equitable). In 1968, Westminster made preliminary arrangements with Aetna Life Insurance Company (Aetna) to refinance the outstanding indebtedness of approximately $5.7 million bearing interest at 4½% and to increase it along with other Westminster properties to $22.5 million at 6%. This necessitated paying off the indebtedness to Equitable.

The Equitable note had originated in 1956 as a loan from American Security and Trust Company to the then owners for $8 million secured by a first deed of trust on the same piece of property. When Equitable purchased the note in 1957 it entered into a modification agreement with the borrower, the provisions of which control this controversy. The modification agreement provides for quarterly installment payments; that partial prepayments may be made up to $500,000 in any one loan year; any prepayment in excess of $500,000 in any loan year is " * * * subject to a prepayment charge of three percent on such excess during the fourth loan year and declining one quarter percent each loan year thereafter"; and that prepayment of the "whole of the principal balance" of the note may be made "on any regular quarterly installment due date" which the agreement specified was "the first day of each February, May, August and November. * * * * " [1]

---

[1]. The pertinent part of the "Agreement of Modification" provides for payment of the note as follows:

The indebtedness represented by the Note * * * shall be payable * * * with interest on said principal sum of $8,000,000.00 of so much there as shall remain unpaid at the rate of four and one half per cent (4½%) per annum

from and after January 9, 1957, as follows:

Interest on said principal sum at said rate of 4½% per annum on the first day of each February, May, August and November, commencing May 1, 1957, to, and including, February 1, 1959.

By letter of September 30, 1968 from its vice president, Westminster informed Equitable that they intended to pay the loan in full on or about December 2, 1968. This date was in between the November and February regular quarterly installment due dates upon which such prepayment was authorized to be made by the terms of the note. The letter requested Equitable to "please confirm to Mr. Ralph Smith of the Title Company the amount necessary to pay off the loan on December 2nd and the daily interest due in case of any delays." It seems clear from Westminster's letter that they contemplated making the regular interest payment on November 1 and paying daily interest thereafter only until on or about December 2nd when the total payment of earned interest, principal and prepayment charge would be made. Equitable replied as requested in the Westminster letter by a letter to the title company handling the closing. This letter dated October 14, 1968, stated:

We have been informed that your office will handle a settlement on the above numbered mortgage in which our loan will be repaid in full.

In connection with the repayment of this mortgage, we have prepared the following statement of account.

| | |
|---|---|
| Balance of Principal | $5,569,007.02 |
| Interest due February 1, 1969 | 62,651.33 |
| Prepayment Charge | 49,916.58 |
| Total Due | $5,681,574.93 |

This statement of account has been prepared on the assumption that the installment due November 1, 1968 will be paid when due.

By this letter Equitable made it clear that they considered "the amount necessary to pay off the loan on December 2nd" included the unpaid principal, interest of $62,651.33 to February 1, 1969 (the next regular quarterly installment due date), as well as the prepayment charge of $49,916.58. The interest figure of $62,561.33 included unearned interest for the period from December 5, 1968 (the actual closing date) to February 1, 1969 amounting to $39,679.17 which is the subject of this action. Westminster's letter accompanying their checks turned over at the closing makes clear their disagreement with Equitable's statement of account. Westminster tendered one check for $5,641,895.76 to cover the unpaid principal, interest to December 5, 1968 and the prepayment charge and in the accompanying letter stated that: "Upon receipt of this check we hereby make demand upon you to take the necessary steps to release the deed of trust on the Seven Corners property securing said note." By the same letter, however, Westminster also tendered and paid under protest a second check for $39,679.17 for the amount of the unearned interest which Equitable claimed was required to be paid by Westminster for the period from December 5, 1968 to February 1, 1969.

In a tightening money market both Westminster and Equitable had ample

Installments of One Hundred Forty Thousand Dollars ($140,000) quarterly on the first day of each February, May, August and November, commencing May 1, 1959, to, and including, November 1, 1976, each such installment to include principal and interest at said rate of 4½% per annum and each installment to be applied first to the payment of interest at said rate on the balances from time to time outstanding, then to be applied to principal.

\*    \*    \*    \*    \*

The further privilege is reserved commencing with the first regular quarterly installment due date in the fourth loan year, as the term "loan year" is hereinafter defined and on any regular quarterly installment due date thereafter of making payments in multiples of Five Thousand ($5,000) Dollars on the principal here in excess of said Five Hundred Thousand ($500,000) Dollars in any one loan year provided the Society is given thirty (30) days prior written notice in case of partial prepayments and sixty (60) days prior written notice in case of prepayment of the whole of the principal balance hereof and further provided that any such payment in excess of the said Five Hundred Thousand Dollars ($500,000) in any one loan year shall be subject to a prepayment charge of three percent (3%) on such excess during the fourth loan year and declining one-quarter (¼%) each loan year thereafter. \*    \*    \*

reason to desire prepayment of this loan on December 5th. Westminster wanted the benefits of its 2-year-old agreements with Aetna for substantially increased financing of $22.5 million at a then favorable rate of 6%, and Equitable was presumably quite happy to receive payment of over $5.5 million which it could reloan at rates higher than the 4½% it was then returning. Their disagreement was handled by both parties in such manner that the question involving the unearned interest for the period from the date of payment to the next regular installment due date was preserved properly for judicial determination. Had Westminster prepaid the note on November 1, 1968, no question would have arisen as to the amount of interest due as the agreement allowed payment on that date. The issue in this case is caused by Equitable agreeing to accept payment to be made on December 5th in the interim between the regular quarterly installment due dates of November 1st and February 1st, a payment date that was not contemplated or provided for in the note agreement.

■■■ Westminster contends that the cashing of the $5,641,895.76 check it tendered for the lesser amount it claimed to be due, operates as an accord and satisfaction of the claim.[2] The fact however is that Westminster tendered two checks together, the second check being for the disputed amount. The proper view of the tender, acceptance of payment and the execution of the satisfaction of the

deed of trust is that their acts did not constitute an accord and satisfaction and neither party waived any claim. Westminster tendered two checks which together totaled the full disputed amount because it wanted a clear title to the property on December 5th and did not want to wait until February 1st to get it. Equitable accepted payment by the two checks and satisfied the encumbrance. Had Equitable not done so they could have caused Westminster to suffer a considerable loss. At the time of the prepayment the parties did not have a meeting of the minds as to their respective legal rights and obligations under their written agreements or as to the consequences of their acts in paying and receiving the full sum claimed; all they did was to insure that neither party would be damaged pending the outcome of a judicial determination of their controversy.[3] Since the intention of the parties at the payment stage is not dispositive of the question we are relegated to the terms of the note agreement where the parties did purport to come to an agreed understanding.

This is not a case of one party, holding a superior bargaining position, leading the other astray through economic coercion or fraud. Both parties are experienced in finance of this type and magnitude. The court's role is to fairly act as an arbiter of this dispute based upon the written agreement of the parties, their intentions, the accepted commercial usage and the applicable law.

2. Karrick v. McEachern, 55 App.D.C. 77, 78, 2 F.2d 126, 127 (1924) holds that for there to be an accord and satisfaction there must be agreement between the parties, a "meeting of the minds." The case relied upon by the appellants, Pugh v. Long, 61 App.D.C. 156, 58 F.2d 882 (1932) is distinguishable on its facts in that only one check was tendered marked "Payment in full on car F.G.E. 35188." The notation on the check imposed a condition upon its use. If the check is cashed, assent to that condition is implied, and the necessary agreement exists constructively for an accord and satisfaction. Nelson v. Chicago Mill & Lumber Corp., 76 F.2d 17, 23 (8th Cir. 1935); Andrews

v. Haller Wall Paper Co., 32 App.D.C. 392, 16 Ann.Cas. 192 (1909).

3. Westminster is actually estopped from arguing that the acceptance of the first check operated as an accord and satisfaction since their letter of December 2, 1968 specifically provides: " * * * that judicial clarification of the difference between our understanding of the requirements of the note and deed of trust and of the understanding of our counsel with respect thereto may be sought." (App. at 12) The parties only acted to mitigate the damages that might be caused by their disagreement.

Westminster maintains that at the very least the agreement is ambiguous and should be construed against the one who drafted it.[4] But we find no ambiguity here. The written agreement between the parties is very clear in providing for prepayment of the "whole of the principal balance" on "any regular quarterly installment due date" and in not providing for prepayment at any other time. It is thus not a case of ambiguity, but the complete absence of any provision for prepayment between specified regular payment dates. So we are required to decide whether in connection with the receipt of an interim payment under an installment note, which makes no provision for interim payment, the law permits a lender to require the payment of unearned interest computed to the earliest payment date authorized in the agreement for the prepayment of the entire amount of the principal.

Although it has often been stated that a lender cannot be compelled to accept prepayment of a mortgage note even when the full amount of interest for the full term of the mortgage is tendered,[5] we find it unnecessary to go this far in deciding the instant case. At the very minimum, it is clear that it is not inconsistent with the terms upon which this loan was made for the lender upon a request for prepayment to require payment of the full amount of interest to the earliest date authorized for such prepayment.[6] From this it follows that

4. *See* North American Graphite Corp. v. Allan, 87 U.S.App.D.C. 154, 157, 184 F.2d 387, 390 (1950).

5. McCarty v. Mellinkoff, 118 Cal.App. 11, 4 P.2d 595 (1931) ; Abbe v. Goodwin, 7 Conn. 377 (1829) (Lender prior to maturity refused to accept payment in full of principal and interest and the court held that it would not "substitute another contract for that which the parties have entered into.") ; In re Agostini, 3 Terry 347, 42 Del. 347, 33 A.2d 306, 309 (1943) (Before the mortgage is due, "the mortgagor has, in general, no right to make payment of the mortgage * * *.") ; Atlantic Life Ins. Co. v. Wolf, 54 A.2d 641, 643 (D.C.Mun.App.1947) (Neither the lender nor the borrower has the right to advance the maturity date of a note payable in installments.) ; Webb v. Southern Trust Co., 227 Ky. 79, 11 S.W.2d 988 (1928) ; Quynn v. Whetcroft, 3 Har. & McH. 136, 1 Am.Dec. 375 (Md.1796) (Tender of principal and interest due on a bond before the due date need not be accepted.) ; Trahant v. Perry, 253 Mass. 486, 149 N.E. 149, 150 (1925) (A borrower cannot compel a lender to accept payment in full of an installment note before maturity.) ; Saunders v. Frost, 5 Pick. 259, 267, 22 Mas. 259, 267, 16 Am. Dec. 394, 399 (1827) ("[T]he mortgagee could not be compelled to receive payment until it became due.") ; Peter Fuller Enterprises, Inc. v. Manchester Savings Bank, 102 N.H. 117, 152 A.2d 179, 181 (1959) ("A mortgagor * * * in the absence of a provision so providing has no right to pay in advance of maturity," citing cases.) ; Bloomfield Savings Bank

v. Howard S. Stainton & Co., 60 N.J. Super. 524, 159 A.2d 443, 447 (App.Div. 1960) (A provision that final payment of principal and interest be payable at maturity "if not sooner paid" did not confer a prepayment privilege and the borrower could not force earlier payment over the lender's resistance.) ; Henderson v. Guest, 197 Okl. 443, 172 P.2d 605 (1946) ("Payment before the law day cannot be enforced by either party," quoting from 2 Jones on Mortgages § 888 (7th ed. 1915)) ; Hensel v. Cahill, 179 Pa.Super. 114, 116 A.2d 99, 100 (1955) (The installment payments stipulated in the note were held to be "both the minimum required and the allowable maximum which the [borrower] * * * was obliged to accept.") ; Brown v. Cole, 60 Eng.Rep. 424 (1845) (Mortgagor desired to redeem the mortgage prior to the date of its maturity by paying the principal and interest due to the date of the offer but the court held that redemption of the mortgage would not be decreed prior to the date agreed upon.) ; *cf.* Beth-June, Inc. v. Wil-Avon Merchandise Mart, Inc., 211 Pa.Super. 5, 233 A.2d 620 (1967) ; 59 C.J.S. Mortgages § 447, at 695 n. 34 (1949).

6. In Atlantic Life Insurance Co. of Richmond v. Wolf, 54 A.2d 641, 643 (D.C. Mun.App.1947), the borrower sought to repay an installment note which did not contain any provision for acceleration. The court held that "The law gave the lender the right to expect performance of the loan agreement according to its terms, and the right to expect the agreed flow of payments, including interest over

Westminster could depart from the terms of the agreement with respect to the amounts and times of payments only with the consent of Equitable and as a condition to granting such consent that Equitable could impose such conditions as were not contrary to law or to the agreement. Thus, in the event a borrower prepays a note which does not authorize prepayment on the date paid, the lender may demand payment of an amount equal to the total interest that would have been paid if the loan had continued until the earliest date upon which such prepayment was authorized.

As to the contention that the prepayment charge specified in the note agreement compelled Equitable to accept the prepayment in the interim between authorized payment dates, we note that a prepayment charge such as the one in subject note is designed to compensate the lender for the fact that the loan does not run to maturity. Although we have found it unnecessary to decide whether Westminster had the right to prepay the mortgage with full interest, it is still clear, in the absence of any contrary provision, that Equitable would have a general right to expect the full payment of interest for the entire term of the note upon any prepayment. Equitable gave up only a portion of this right by allowing prepayment on certain specified dates with interest running only to those dates; hence, it is logical to require that this prepayment privilege to which the parties have agreed be exercised strictly in accordance with its terms and that Equitable should not be presumed to have given up more than which it can literally

be shown to have assented. Westminster could have prepaid the entire indebtedness on November 1, 1968 without the payment of any unearned interest, and it would have been within the terms of the contract. Instead, it made only the regular installment payment on November 1st and continued to enjoy the use of the same $5 million under the liberal terms of its note with Equitable until December 5th when the payoff occurred. During this period it was paying Equitable 4½% in interest whereas Aetna would be paid 6%.

It may well have been somewhat of a windfall for Equitable to have received the principal amount before the running of the term of the mortgage, given the higher interest rates then prevailing, but we should not take this into account in interpreting the contract. It is not our function to write what would have been a fair contract as of December 5, 1968. We only apply the agreement the parties made of their own accord.[7]

On December 5th, Westminster by two checks tendered the full amount of principal, prepayment charge and the full amount of interest due on the next interest payment date; Equitable then performed its obligation by discharging its encumbrance on the land. To now require Equitable to surrender that portion of the payment represented by the unearned interest computed to the next payment date would in effect require it to surrender a benefit it bargained for without any new bargain having been made. When Equitable was tendered the payment charge and the full payment due on the next regular installment date,

the fifteen-year term of the loan." Peter Fuller Enterprises v. Manchester Savings Bank, 102 N.H. 117, 152 A.2d 179 (1959) held that where a mortgage note contained no prepayment provision the borrower did not by his own default in making the specified installment payments acquire such right under the acceleration clause. McCarty v. Mellinkoff, *supra* note 5. In Hensel v. Cahill, *supra* note 5, the court upheld the demand of a mortgage for unearned interest at half the rate to the end of the term of the mortgage which had twelve years to run. In comparison, such

period dwarfs the claim here which is only for 58 days. *See generally,* 75 A.L.R.2d 1265 (1961) ; 130 A.L.R. 73, 76 (1941) ; 6A. Corbin on Contracts 696–697 (1962), and 3 Powell, Real Property 655–656 n. 4 (1966).

7. Columbia Hospital for Women and Lying-in Asylum v. United States Fidelity & Guaranty Co., 88 U.S.App.D.C. 251, 256, 188 F.2d 654, 659, cert. denied, 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618 (1951).

it satisfied the lien it held but it could be required to do nothing more. It was not required to return the check for unearned interest.

Upon such facts, we decide, it was proper for the District Court to rule that the unearned interest paid under protest was due and owing to Equitable and to grant summary judgment for the defendant.

Affirmed.