**In re A.J. LANE & CO., INC., Lane Homes, Inc., Lane Management, Inc., Fountainhead Associates of Westborough, Andrew J. Lane, Debtors.**

Bankruptcy Nos. 89–40268–JFQ to 89–40272–JFQ.

United States Bankruptcy Court,
D. Massachusetts.

May 1, 1990.

Scott D. Rosen, Hoberman & Pollack, Hartford, Conn., for Shawmut First Bank and Trust Co.

George Tetler, Bowdith & Dewey, Worcester, Mass., for Official Creditors' Committee.

Charles Dougherty, Hill & Barlow, Boston, Mass., for debtor.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

The Official Unsecured Creditors' Committee (the "Committee") moves for disallowance of the prepayment charge asserted by Shawmut First Bank and Trust Company (the "Bank") under its loan documents with the individual Debtor, Andrew J. Lane. Presented are questions of whether a prepayment charge is subject to the principles governing provisions for liquidated damages, and, if so, whether these charges are valid under such principles. The questions are complicated by some disagreement in the decisions over whether state law or federal bankruptcy law controls.

A non-evidentiary hearing has been held. There is no factual dispute. The Debtor is the obligor under two promissory notes, one dated January 26, 1987 in the principal sum of $1,300,000 (the "refinance note") and the other dated March 29, 1988 in the principal sum of $1,150,000 (the "construction note"). The refinance note represents a loan made in connection with the Debtor's purchase of property at 200 Tapley Street, Springfield, Massachusetts (the "property"); the construction note was for the financing of a 40,000 square foot addition to the building on the property. Both notes were given pursuant to a $2,450,000 loan commitment contained in a loan agreement with the Bank dated January 26, 1987, and both were secured by a first mortgage on the property. The refinance note bears interest at a flat eleven percent; the construction note has a variable rate equal to the Bank's "stated Corporate Base Rate as determined and published from time to time and ONE PERCENT (1%) per annum." Each note calls for monthly payments based upon a twenty five year amortization schedule, with "the entire unpaid balance of principal and interest due and payable on January 26, 1994."

The present controversy centers upon the following provision on prepayment contained in both notes:

The BORROWER shall have the right to prepay the unpaid balance of principal in whole or in part on any date on which a payment of principal is due hereunder, provided that the BORROWER shall pay a pre-payment penalty (except during the last ninety (90) days of the term of this Note during which time no pre-payment penalty shall be required) equal to the amount so prepaid times One Percent (1%) times the number of years or portions thereof expressed as a fraction remaining on term of the Loan; and provided however, that if such prepayment shall be of the entire unpaid balance of principal, then accrued interest to the

date of such prepayment shall also be paid, and if such pre-payment be of less than the entire unpaid balance of principal, such prepayment shall be applied to installments due hereunder in the inverse order of maturity.

The loan documents also contain provisions concerning sale of the property. The mortgage states that "a default in this mortgage shall occur ... upon the sale, transfer, vesting of the title, or mortgaging of any or all of the [property] ... without the written consent of the [Bank] ..." Each note provides that upon default under either the note or the mortgage "then the entire remaining balance shall, at the option of the [Bank] become immediately due and payable." Under the loan agreement, on the other hand, the Bank agreed to consider acceptance of substitute collateral in exchange for a discharge of the mortgage if the Debtor desired to sell the property.

During the course of the Chapter 11 proceeding, the Debtor sold the property at a price which exceeded the Bank's debt plus the prepayment charge, and on January 3, 1990 paid the Bank the entire balance of principal and interest due under both notes. The Bank's prime interest rate, which it calls its "stated Corporate Base Rate," was 10.5% per annum on January 3, 1990, having risen from 7.5% on January 26, 1987, the date of the refinance note, and from 8.5% on March 29, 1988, the date of the construction note. The Bank never exercised any option which it may have had to accelerate the balance due under the notes by reason of the sale of the property or for any other reason. Nor was it offered any collateral in substitution for the property. The Debtor declined to pay the Bank the prepayment charge which it requested in the sum of $96,361.62, calculated as follows: $1,275,981.46 (principal balance of refinance note) × 1% × 4 years remaining on term of loan = $51,039.26, plus $1,133,-058.89 (principal balance of construction note) × 1% × 4 years remaining on term of loan = $45,322.36. The parties agreed to place the amount of the requested prepayment charge in escrow, pending a determination by this court of the validity of the charge.

## I. GOVERNING LAW

Both parties elide the question of whether Massachusetts law or federal bankruptcy law, or both, controls. The Bank urges enforcement of the charge under either Massachusetts common law or § 506(b) of the Bankruptcy Code, 11 U.S.C. § 506(b). The Committee argues for invalidity of the charge under Massachusetts law. It contends, in the alternative, that even if the charge is otherwise valid under Massachusetts law, it is allowable under § 506(b) only to the extent of any actual damage which the Bank may have sustained.

Section 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The amount sought here is described in both notes as a "penalty" rather than a "charge" or a "premium." Whatever rubric appears in the loan documents, the statutory language compels the conclusion that this requested payment is one of the "charges" which § 506(b) governs. Indicative is the additional use in § 506(b) of the more restrictive words "fees, costs," and the appearance in the following subparagraph (c) of the phrase "costs and expenses." Clearly, the term "charges" in § 506(b) encompasses more than out-of-pocket expenses.

The prime question is whether the standard of reasonableness mandated by § 506(b) requires federal courts to fashion their own rules governing what charges are reasonable, unrestrained by state law. Under the prior Bankruptcy Act, the enforceability of such provisions in mortgage notes was governed by state law. *Security Mortgage Co. v. Powers*, 278 U.S. 149,

153–54, 49 S.Ct. 84, 85–86, 73 L.Ed. 236 (1928) (Georgia statute requiring suit to collect attorneys fees deemed controlling on enforceability of ten percent attorney fee clause in mortgage note); *ITT—Industrial Credit Co. v. Hughes,* 594 F.2d 384, 386–87 (4th Cir.1979) (court applied North Carolina statute imposing notice requirement for collection under attorney fee clause in mortgage note).

The prior Bankruptcy Act, however, had no express requirement that the fees, costs or charges assessed by secured lenders be reasonable. Section 506(b) does, and this requirement alone indicates an intention to impose a single, federal standard. The entire statutory framework bears this out. It is of course true that the enforceability of claims is generally controlled by state law, except for certain claims such as claims for future rent or for damages from termination of employment. 11 U.S.C. § 502. But claims which are senior to general, unsecured claims bear special scrutiny. Only "actual, necessary costs and expenses of preserving the estate" are granted a first priority. 11 U.S.C. § 503(b)(1)(A). Included are fees of attorneys, the same type of claim covered by § 506(b); these must be "reasonable." 11 U.S.C. §§ 330(a)(1), 503(b)(2). Few would suggest that the standard of reasonableness governing fees under § 330(a)(1) should be anything other than a single, federal standard. The protection of general creditors from unreasonable fees enjoying first priority is central to the bankruptcy policy favoring a fair distribution to creditors. Yet this policy applies with even greater force to charges under § 506(b). The claim of a secured creditor to his collateral is of course senior to that of even a first priority claimant such as an attorney rendering services to the estate. It would make no sense to interpret "reasonable" as it appears in § 506(b) according to state law while applying a federal standard to "reasonable" under § 330(a)(1) governing attorneys' fees.

Legislative history also supports a single, federal standard. Section 506(b), as originally passed by the House, read in part: "[T]here shall be allowed to the holder of such claim, *to the extent collectible*

*under applicable law* interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose." (emphasis supplied). H.R. 8200, 95th Cong., 1st Sess. § 506(b). The version of § 506(b) originally passed by the Senate, however, omitted this reference to other law, but otherwise adopted the same language. The difference between the two versions was resolved without a formal conference, with the Senate's version prevailing. Representative Edwards of the House Committee on the Judiciary and Senator DeConcini of the Senate Committee on the Judiciary reported to their respective branches on the compromise version. Both explained that the Senate version had been adopted and that, as a result, "[i]f the security agreement between the parties provides for attorneys' fees, it will be enforceable under title 11, notwithstanding contrary law ..." 124 Cong. Rec. H11095 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17411 (daily ed. Oct. 6, 1978). Passage of the Bankruptcy Code by both branches followed shortly thereafter.

This legislative process, particularly the change in wording that the statute underwent, indicates that federal and not state law controls. I do not regard as critical the statement in the report of the Committee on the Judiciary of both the House and the Senate that "[S]ubsection (b) codifies current law ..." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356–7 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854, 6312. The statement made in the Senate report, which came later, could well have been an unintentional repetition of the House report. In any event, the change wrought in the actual language of § 506(b) is most crucial. Most courts that have faced the question agree with this interpretation. *See, e.g., Blackburn–Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.),* 794 F.2d 1051, 1056–58 (5th Cir.1986) (state standards of reasonableness governing attorneys' fees inapplicable); *Joseph F. Sanson Inv. Co. v. 268 Limited (Matter of 268 Ltd.),* 789 F.2d

674, 675–77 (9th Cir.1986) (same); *Unsecured Creditors' Committee v. Walter E. Heller & Co. Southeast, Inc.*, 768 F.2d 580, 585 (4th Cir.1985) (court deemed it irrelevant that creditor failed to comply with state statute making attorney fee agreement enforceable only after debtor fails to pay fees following five day notice); *In re Planvest Equity Income Partners IV*, 94 B.R. 644 (Bankr.D.Ariz.1988) (prepayment penalty disallowed under § 506(b) only); *In re American Metals Corp.*, 31 B.R. 229, 236–37 (Bankr.D.Kan.1983) (federal standard applied to prepayment charges after review of legislative history). Although many of these decisions involved attorneys' fees, the same statutory construction is warranted for prepayment charges, notwithstanding that only attorneys' fees were mentioned on the floor of Congress. Prepayment charges are equally included in the language changes made to § 506(b). And it would be senseless for prepayment charges to be governed even in part by state law while attorneys' fees under the same statute are controlled solely by federal law. I therefore respectfully disagree with those decisions which have applied both federal *and* state law to prepayment charges under the express or implied thesis that all claims must be supported by state law. *In re Kroh Bros. Dev. Co.*, 88 B.R. 997 (Bankr.W.D.Mo.1988) (both federal and state standard applied); *Ferrari v. Barclays American/Business Credit, Inc. (In re Morse Tool, Inc.)*, 87 B.R. 745 (Bankr.D. Mass.1988) (same); *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987) (same). *See also Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Ass'n (In re Imperial Partners, Ltd.)*, 96 B.R. 997, 999 (Bankr. 9th Cir.1989) (federal law applied to prepayment charges because lender a federally chartered institution).

■ Federal courts therefore write on a slate which is clear of binding state court precedent. But the standard of reasonableness is the essence of law. It requires an assessment and balancing of the competing interests of borrower and lender. In the absence of binding precedent in this circuit, I seek guidance from decisions in all jurisdictions dealing with assessment of prepayment charges or analogous transactions.

## II. PREPAYMENT CHARGE AS A REASONABLE CHARGE UNDER § 506(b)

### A. *Traditional Treatment of Prepayment Charges*

Except for the recent bankruptcy court decisions later referred to in Part II B, courts have traditionally treated prepayment charges rather benignly. Although often discussing their propriety in general terms of reasonableness, courts have not imposed the restrictive test applicable to liquidated damage provisions. This test requires the damages agreed upon to be "reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." *See* Restatement (Second) of Contracts § 356(1) (1981).

*Renda v. Gouchberg*, 4 Mass.App.Ct. 786, 343 N.E.2d 159 (1976) is a typical example. A second mortgage note imposed a prepayment charge equal to "one half of the interest that would have been paid from the date of prepayment to the end of the term." *Id.* The makers paid the holder the principal balance of $22,978.20 plus all interest accrued to the date of payment, but they refused to pay the prepayment charge calculated at $9,138.66. *Id.* The Massachusetts Appeals Court, the Commonwealth's intermediate appellate court, reversed the trial judge, who had voided the charge as a penalty. Noting the absence of any proven usury law violation, the court held that the prepayment charge bore a reasonable relation to the noteholder's actual damages by giving him the benefit of his bargain, adding: "Because the defendant, as second mortgage holder, was not required to permit prepayment ... and because the plaintiffs' prepayment constituted a voluntary election on their part, cases concerning penalties payable as 'liquidated damages' in the event of breach ... are inapposite." *Id.* at 786, 343 N.E.2d at 160. The court made no attempt to assess what the noteholder's actual damages were, or to calculate what damages

could have been reasonably anticipated at the note's execution.

As reflected in *Renda v. Gouchberg*, prepayment is often regarded as a voluntary act which is somehow different from the voluntary breach of any other type of contract. The contract represented by the note is treated as one which gives the maker the election to render either one of two alternative performances—payment over the full term or early payment. Under this view, prepayment is not a breach of contract, so that there is no occasion to apply the rules governing a provision for liquidated damages in the event of breach. *See, e.g., William v. Fassler*, 110 Cal. App.3d 7, 167 Cal.Rptr. 545 (1980); *Meyers v. Home Sav. & Loan Ass'n*, 38 Cal.App.3d 544, 113 Cal.Rptr. 358 (1974); *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Ass'n*, 22 Cal.App.3d 303, 99 Cal. Rptr. 417 (1971); Note, *Prepayment Penalties: A Survey and Suggestions*, 40 Vand.L.Rev. 409, 422–24 (1987). These same courts nevertheless assume that obviously exorbitant charges are unenforceable. In *Lazzareschi Inv. Co.*, for example, the court concluded that the prepayment charge was reasonable only after measuring it against usual prepayment charges and prepayment charges authorized by FHLBB regulations. *Id.* at 308–11, 99 Cal. Rptr. at 420–23.

Courts have found economic justification for a prepayment charge in the charge's ability "to compensate the lender for the fact the loan does not run to maturity." *Westminster Investing Corp. v. Equitable Assurance Soc'y of the United States*, 443 F.2d 653, 658 (D.C.Cir.1970). If the loan is at a fixed interest rate, and market interest rates are lower at the time of prepayment, the lender does suffer a loss from prepayment. But prepayment charges are usually upheld without regard to whether the lender is actually damaged by the payment. Thus, in *Westminster Investing Corp.*, interest rates had actually risen since the granting of the loan, yet the prepayment charge was upheld. The court stated: "It may well have been somewhat of a windfall for Equitable to have received the principal amount before the running of the term of the mortgage, given the higher interest rates then prevailing, but we should not take this into account in interpreting the contract." *Id.* at 658. As this statement also indicates, courts have been influenced by notions of freedom of contract. Thus creditors have been allowed to impose a charge for early payment even where there is no provision for the charge in the loan documents. In *Houston N. Hosp. Properties v. Telco Leasing, Inc.*, 680 F.2d 19, 22–33 (5th Cir.1982), for example, the Fifth Circuit upheld a mortgagee's refusal to release its lien on prepayment, stating: "Having a good investment that did not require acceptance of prepayment, it could use market tactics to exact a profit. Our entrepreneurial economic system does not exact moral scruples in deals between parties of equal bargaining power."

Where the mortgaged property is taken by eminent domain or destroyed by casualty, and prepayment is made from the condemnation award or the insurance proceeds, the theory of voluntary alternative performance fails, and the prepayment charge is usually disallowed. *See, e.g., Chestnut Corp. v. Bankers Bond & Mortgage Co.*, 395 Pa. 153, 149 A.2d 48 (1959); *Associated Schools, Inc. v. Dade County*, 209 So.2d 489 (Fla.Dist.Ct.App.1968); *Dekalb County v. United Family Life Ins. Co.*, 235 Ga. 417, 219 S.E.2d 707 (1975). Here the supposed economic justification for the charge is ignored. The theory of voluntary alternative performance also fails where the lender has exercised his option to accelerate upon default and demands payment in full. Indeed, in that situation the payment is not a prepayment at all. *See, Matter of LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir.1984); *In re Pinebrook, Ltd.*, 85 B.R. 160, 162 (Bankr. M.D.Fla.1988); *Kilpatrick v. Germania Life Ins. Co.*, 183 N.Y. 163, 75 N.E. 1124 (1905).

The Committee argues that the payment was involuntary. It seems to assume that the payment itself accelerated the due date of the entire debt. Payment of course does not cause acceleration, and the Bank took no action which constituted the exercise of

any right to accelerate it may have had. The Committee also contends that the prepayment was involuntary because it was made in the context of a bankruptcy proceeding involving liquidation of most of the Debtor's properties, including the mortgaged property. There was nothing compelling the Debtor to sell this property. He could have chosen to retain it along with the three properties he intends to retain under the Chapter 11 plan of reorganization which he has filed. The Committee's reliance on *In re Cole*, 93 B.R. 707 (Bankr. 9th Cir.1988) is misplaced. That decision involved policies favoring a homestead exemption dependent upon the involuntary nature of a sale. *Id.* at 709. In any event, the voluntary aspect of a prepayment has relevance only under the theory that a prepayment charge is part of an alternative performance which the obligor has voluntarily elected to render. I now turn to the merits of that theory.

### B. *Prepayment Charges as Liquidated Damages—In General*

In the absence of a clause permitting prepayment, the courts of this county and England have regarded prepayment as a breach of contract since the decisions in *Abbe v. Goodwin*, 7 Conn. 377 (1829) and *Brown v. Cole*, 14 L.J.—Ch. 167 (1845). This treatment has been criticized for its lack of foundation in the earlier case law and for its conflict with equitable principles of property law protecting the debtor's right to obtain a mortgage discharge upon payment. *See* Alexander, *Mortgage Prepayment: The Trial of Common Sense*, 72 Cornell L.Rev. 288, 290–308 (1987). This view may have been, in part, a product of the school of formalism which required literal compliance with all terms of a contract. *Id.* at 317. The prepayment charge, in any event, is a natural result of treating prepayment as a breach, and the charge should be considered in that light. When so considered, it is clear that the charge is a liquidated damage provision inserted to compensate the lender for the breach of early payment, and is not part of an alternative performance.

Under a true alternative contract, performance does not, of itself, constitute a breach of the other alternative promise. Yet that is what prepayment constitutes. An alternative contract, moreover, is one in which either alternative is equally open to the promisor. 5 W. Jaeger, *Williston on Contracts* § 781 (3d ed. 1961). When these notes were signed, prepayment was not as equally open to the Debtor as was payment over time; if it were, the Debtor would not have borrowed the money. The practical opportunity for prepayment arose only when the property was sold. Nor can prepayment be deemed an alternative performance from the viewpoint of the Bank. Perhaps the Bank could look upon it as an alternative performance if at the time of the loans the Bank had reason to believe that the notes would be prepaid, and if it relied upon that belief. *See* MacNeil, *Power of Contract and Agreed Remedies*, 47 Cornell L.Rev. 495, 500 (1962). Here the Bank had no reason to think that prepayment was likely. And even where, unlike here, the contract expressly provides for alternative performances, courts must look to the substance of the matter to determine whether in reality there is a provision for liquidated damages. *See* Restatement of Contracts (Second) § 356 comment c, illustration 5 (1981). The prepayment charge in each of these notes is a provision for liquidated damages, and it must be measured by the rules applicable to such provisions. A number of courts have come to this conclusion. *See Imperial Coronado Partners, Ltd., v. Home Fed. Sav. & Loan Ass'n (In re Imperial Coronado Partners, Ltd.)*, 96 B.R. 997 (Bankr. 9th Cir.1989); *Conn. Gen. Life Ins. Co. v. Schaumberg Hotel Owner Ltd. Partnership (In re Schaumberg Hotel Owner Ltd. Partnership)*, 97 B.R. 943 (Bankr.N.D.Ill.1989); *In re Planvest Equity Income Partners IV*, 94 B.R. 644 (Bankr.D.Ariz.1988); *In re Kroh Bros. Dev. Co.*, 88 B.R. 997 (Bankr. W.D.Mo.1988); *Ferrari v. Barclays American/Business Credit, Inc. (In re Morse Tool, Inc.)*, 87 B.R. 745 (Bankr.D.Mass. 1988); *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987); *In re American*

*Metals Corp.*, 31 B.R. 229 (Bankr.D.Kan. 1983).

### C. *Validity of These Prepayment Charges Under Rule for Liquidated Damages*

■ Provisions for liquidated damages have been subjected to judicial scrutiny for over five centuries, beginning with the exercise by courts of chancery of equity powers against penalties. Relief is afforded even when the transaction is fully voluntary and the parties have equal bargaining power. *See* Goetz & Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 Colum.L.Rev. 554, 588–93 (1977); Comment, *Liquidated Damages: A Comparison of the Common Law and the Uniform Commercial Code*, 45 Fordham L.Rev. 1349, 1349 (1977).

■ I adopt the statement of the rule on liquidated damages which is contained in § 2–718(1) of the Uniform Commercial Code, as simplified in § 356(1) of the Restatement (Second) of Contracts. This statement of the rule has the greatest impact upon the law today, and it is the product of the most thorough and current study of the subject.

U.C.C. § 2–718(1) provides:

Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach,[1] the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

Section 356(1) of the Restatement states:

Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

The rule's formulation under § 356(1) represents a redraft which was adopted in order to harmonize the Restatement with U.C.C. § 2–718(1). *See* Restatement (Second) of Contracts § 356 reporter's note (1981). The Restatement's previous version of the rule measured reasonableness only against anticipated harm, with no alternative test of actual harm. *See* Restatement of Contracts § 339(1) (1932). Present § 356 omits the reference contained in U.C.C. § 2–718(1) to "the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy" as already subsumed in the other language. Restatement (Second) of Contracts § 356 reporter's note (1981).

The interplay of the two factors to be taken into account in determining reasonableness is explained in comment b of § 356:

[T]wo factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches ... Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss ... The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty (see § 351), the easier it is to show that the amount fixed is reasonable. To the extent there is uncertainty as to the harm, the estimate of the

---

**1.** Adoption in § 2–718(1) of actual loss as an alternative test of reasonableness resolved a conflict in the case law. A minority of courts had excluded evidence of actual harm and focussed only on the damages that could reasonably be anticipated at the time of execution. *See* Comment, *Liquidated Damages: A Comparison of the Common Law and the Uniform Commercial Code*, 45 Fordham L.Rev. 1349, 1354 (1977).

court or jury may not accord with the principle of compensation any more than does the advance estimates of the parties . . .

Restatement (Second) of Contracts § 356 comment b (1981).

■■■ The first of these two factors does not support the Bank's prepayment charge. The Bank's prepayment charge presumes that damages will be sustained and that these will equal lost interest income of one percent for the balance of the loan. At the time of the loans, the most significant damage that the Bank could incur by a prepayment was inability to reloan the funds at an interest rate at least as high as the rates under the notes. But this was not a probability at the time of either of the loans. Economic conditions are variable; it was then as likely as not that market rates at the time of prepayment would be higher than the contract rate, with the Bank incurring a benefit from the prepayment rather than a loss. And, as discussed below, this is precisely what happened. To presume a loss is unreasonable. *Cf. Kroh*, 88 B.R. at 1001–2 (prepayment charge deemed unreasonable because the debtor was not provided with an alternative credit if market interest rates were above the contract rate at the time of prepayment). This prepayment formula bears even less of a rational relationship to loss than does a formula comparing the loan's projected interest yield to the projected yield from treasury notes that could be purchased at the time of prepayment; this type of formula has been properly rejected both for its failure to compare the contract rate to the current interest rate on comparable loans and for its failure to discount the lost interest yield to present value. *See Kroh, supra; In re Skyler Ridge*, 80 B.R. at 505.

This prepayment charge also fails the alternative test requiring a reasonable relationship between the amount of the charge and the Bank's actual loss. The Bank's prime rate on the date of payment, January 3, 1990, was 10.5%, up from 7.5% on January 26, 1987, the date of the refinance note which had a fixed rate of 11%. This means that the Bank could re-lend the money at more than 11%, so that it benefited from the prepayment rather than suffered damage. And of course there never was a chance that prepayment of the construction note could cause a loss in interest income; that rate was tied to prime.

Other aspects of the Bank's actual or potential loss are insignificant, and they are more than outweighed by the benefit which the Bank received. Prepayment did require the Bank to expend additional effort to re-loan the funds. But this involves no material out-of-pocket expenses. The Bank's loan documents with the Debtor, which are presumably standard, require the borrower to pay all fees and expenses, including the fees of attorneys and any "advising professional." Although there would presumably be some time lag before the funds could be reloaned in a comparable transaction, they could be quickly invested in safe if somewhat less profitable securities. *See In re Skyler Ridge*, 80 B.R. at 506. The prepayment charge bears no reasonable relationship to any such small loss of income.

Nor is the Bank aided by the second factor in the rule on liquidated damages, difficulties of proof of loss. The only substantial loss that can be incurred from prepayment of a fixed interest loan, the reduction in interest income on re-loaning the funds, is easily proven. The damage formula is simple and well established. It is the difference in the interest yield between the contract rate and the market rate at the time of prepayment, projected over the term of the loan and then discounted to arrive at present value. *See, e.g., Teachers Ins. & Annuity Ass'n of America v. Butler*, 626 F.Supp. 1229, 1236 (S.D.N.Y.1986) (suit by bank for failure by borrower to close on loan commitment); *Kroh*, 88 B.R. at 1000–01 (prepayment charge); *In re Skyler Ridge*, 80 B.R. at 505 (prepayment charge). Any prepayment charge should be wholly or largely dependent upon such a calculation.

One writer has advocated upholding all prepayment charges in commercial paper on the ground that uncertainty in the enforceability of such instruments would

have an adverse effect upon the secondary mortgage market, because mortgages with unpredictable maturity dates are worth less, which in turn would cause a borrower to pay higher interest rates. *See* Alexander, *Mortgage Prepayment: The Trial of Common Sense*, 72 Cornell L.Rev. 288, 328–43 (1987). But uncertainty about the validity of prepayment charges does not make the maturity date of such investments less predictable. As this case demonstrates, prepayment will still occur. Application of the liquidated damages rule to prepayment charges affects only the validity of the charges themselves, not the likelihood that a stream of periodic payments from a pool of mortgage notes will or will not continue.

## III. CONCLUSION

The Bank's prepayment charge is unreasonable in light of either its anticipated or actual loss from prepayment, and in light also of the ease of proving any loss which it might have incurred had interest rates been lower at the time of prepayment. The charge is therefore disallowed under § 506(b) of the Bankruptcy Code.

A separate order has issued disallowing the charge in full and directing release of the escrow fund to the Debtor.