In re FINANCIAL CENTER
ASSOCIATES OF EAST
MEADOW, L.P., Debtor.

FINANCIAL CENTER ASSOCIATES OF
EAST MEADOW, L.P., Plaintiff,

v.

TNE FUNDING CORPORATION,
Defendant.

Bankruptcy No. 191–16391–352.
Adv. No. 191–1595.

United States Bankruptcy Court,
E.D. New York.

May 14, 1992.

Sachs & Kamhi, P.C., Carle Place, N.Y., for debtor.

Windels, Marx, Davies & Ives, New York City, for TNE Funding Corp.

DECISION ON MOTION TO DISMISS THE CASE AND THE ADVERSARY COMPLAINT, TO LIFT THE AUTO-MATIC STAY AND FOR ADEQUATE PROTECTION

MARVIN A. HOLLAND, Bankruptcy Judge:

This opinion deals only with three of the issues raised by the parties: (i) Under New York law is the appointment of a receiver of rents and profits considered perfection of an assignment of rents as additional security contained in a mortgage of real property; (ii) Can the appointment of a receiver of rents and profits in a mortgage foreclosure within the statutory period be avoided as preferential; and (iii) To what extent, if any, is a pre-payment charge binding and enforceable pursuant to 11 U.S.C. § 506(b) and New York law.

We hold that the appointment of a receiver to collect rents is not considered "perfec-tion" of the assignment of rents, that no avoidable preferential transfer ensues from the appointment of a receiver, and that the pre-payment charge herein is not avoidable.

These proceedings are subject to bank-ruptcy court jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and the Order of Referral of Matters to Bankruptcy Judges for this District, 69 B.R. 186. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(E), (F), (G) and (H).

### Background

1. On December 8, 1989 TNE Funding Corporation (hereinafter "TNE") com-menced an action to foreclose its mortgage on the Debtor's only substantial asset, its leasehold estate in the property known as 90 Merrick Avenue, East Meadow, New York (hereinafter "the Real Property").

2. On September 11, 1991 an order ap-pointing a receiver to collect rents and oth-er income from the Real Property was en-tered in New York State Supreme Court, Nassau County. The receiver did not take possession of the property.

3. On October 1, 1991 the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 et seq.).

4. By a notice of motion dated Novem-ber 8, 1991 and an amended notice of mo-tion dated November 22, 1991, TNE moved for the following relief: (i) dismissal of the case for bad faith filing; (ii) in the alterna-tive, vacatur of the automatic stay to per-mit the receiver to collect the rents issuing from the Real Property and to permit TNE to proceed with its foreclosure action; and (iii) granting TNE adequate protection for its interest in the Real Property and in the rents which constitutes cash collateral.

5. The Debtor filed papers in opposition to TNE's motion as well as an adversary proceeding. The Debtor argued: (i) the petition was filed in good faith; (ii) acceler-ation of the Debtor's debt upon default triggers an unconscionable payment charge which if voided would leave the creditor oversecured; (iii) the Debtor has equity in the Real Property and the Real Property is essential for effective reorganization; (iv)

the appointment of a receiver in the state court proceeding is a perfection of the rent assignment which should be avoided as preferential.

Although TNE did not file a formal motion to dismiss the adversary complaint, it was agreed at the December 18, 1991 hearing that TNE's reply memorandum would be treated as a motion to dismiss.

6. On February 6, 1992 the court ruled from the bench in favor of TNE by refusing to invalidate the pre-payment clause, holding that the appointment of a receiver not be considered as perfection of the assignment of rents and cannot be avoided as preferential transfer. The court did not rule on the good faith argument as no evidence was taken and since the other pending issues may turn the good faith issue moot.

7. This opinion is written at the request of the parties to amplify portions of the court's bench ruling.

8. The court would like to commend both attorneys upon the quality of their presentations and for their professionalism throughout this proceeding.

## DISCUSSION

### I. *Appointment of a Receiver is not Perfection of the Assignment of Rents*

■ For a long period of time courts have failed to distinguish between "perfection" of an assignment of rent and the "triggering event" prerequisite to its enforcement. The cases, many of which are cited in the Debtor's papers, speak of the appointment of a receiver of rents and profits as a perfection of the assignment. However under New York law, rents are considered interests in real property [1] and

as such a security interest in rents is perfected upon recordation. See, N.Y.R.P.L. §§ 291, 294–a (McKinney 1989 & 1991 Supp.); 74 N.Y.Jur.2d, Landlord and Tenant, §§ 334, 335 (1988 & 1991 Supp.).

■ Sections 547(e)(1) and (e)(2) of the Bankruptcy Code are interrelated. Section 547(e)(2) provides that a transfer is made at the time it takes effect between the parties if it is perfected within ten days, or at the time of perfection [2]; while § 547(e)(1) defines what is considered perfection. Pursuant to § 547(e)(1) a "transfer of real property other than fixtures ... is perfected when a bona fide purchaser ... cannot acquire an interest that is superior to the interests of the transferee." 11 U.S.C. § 547(e)(1)(A). In the absence of a Bankruptcy Code test to determine the rights of a bona fide purchaser, state law controls. See *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Barnhill v. Johnson*, —— U.S. ——, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

In New York recordation protects the assignee under an assignment of rents against an intervening bona fide purchaser. N.Y.R.P.L. § 294–a. Since TNE recorded its assignment of rents on September 24, 1985, the transfer of the security interest is considered to have occurred on that date, at the latest. 11 U.S.C. § 547(e)(2)(B). As TNE's security interest in the rents was perfected some six years prior to the filing of the petition in bankruptcy it cannot now be avoided pursuant to § 547.

The debtor cites cases that characterize the appointment of a receiver as perfection of the security interest in rents. Those cases miss the point and their position has been rejected in numerous decisions. See, *In re Vienna Park Properties*, 136 B.R. 43 (S.D.N.Y.1992); *In re Northport Marina*

---

**1.** See, N.Y.R.P.L. § 2(1) (McKinney 1985 & 1991 Supp.), "The terms 'real property' and 'lands' as used in the first eight articles of this chapter are co-extensive in meaning with lands, *tenements* and hereditaments" (emphasis added); *Caufield v. Ford*, 28 Barb. 336, 338 (1858), "Tenements is a word of greater meaning and extent than lands, and includes not only land, but *rents*, commons, and several other rights and interests issuing out of or concerning land." (emphasis added). See, e.g., *Markantonis v. Madlan Realty*

*Corp.*, 262 N.Y. 354, 359, 186 N.E. 862 (1933); *In re Brose*, 254 F. 664 (2d Cir.1918); *Vecchiarelli v. Garsal Realty, Inc.*, 111 Misc.2d 157, 159, 443 N.Y.S.2d 622 (1980); *Ryen v. Park Hope Nursing Home, Inc. (In re Flower City Nursing Home, Inc.)*, 38 B.R. 642, 645 (Bankr.W.D.N.Y.1984).

**2.** If the transfer is not perfected, see 11 U.S.C. § 547(e)(2)(C).

*Associates,* 136 B.R. 911 (Bankr.E.D.N.Y. 1992); *In re White Plains Development Corp.,* 136 B.R. 93 (Bankr.S.D.N.Y.1992); *In re White Plains Development Corp.,* 137 B.R. 139 (Bankr.S.D.N.Y.1992); *In re Rancourt,* 123 B.R. 143 (Bankr.D.N.H. 1991); *In re Park at Dash Point, L.P.,* 121 B.R. 850 (Bankr.W.D.Wash.1990).

## II. *Appointment of a Receiver does not Result in a Preferential Transfer*

█ The appointment of a receiver to collect rents cannot be avoided as preferential transfer pursuant to the exception to 11 U.S.C. § 547(c)(5) since this section requires the existence of a transfer which "creates or perfects security interest." Assuming, arguendo, that an appointment of receiver were to result in a "transfer" under New York law, and further assuming that the conditions which entitle a trustee to avoid the transfer under § 547(c)(5) were met, TNE's security interest had been created and perfected years prior to the Debtor's filing for bankruptcy. Furthermore, we are doubtful whether § 547(c)(5), which specifically refers to "inventory or a receivable", applies to rents. "Receivables" usually connote choses in action and as such are classified as an intangible personal property while in New York rents are classified as real property interests.

The Debtor next argues that the appointment of a receiver of rents results in an avoidable preference pursuant to 11 U.S.C. § 547(b). There is no real dispute that the conditions set in § 547(b)(1) through (4) were met. Two issues remain however: 1) whether or not a transfer occurs as a result of the receiver's appointment, and 2) if it does, does this enable the creditor to receive more than it would have received if the case were a Chapter 7 case and the transfer had not been made. 11 U.S.C. § 547(b)(5).

(i) Transfer is defined as "every mode, direct or indirect, absolute or conditional voluntary or involuntary, of disposing of or parting with property or with an interest in property ..." 11 U.S.C. § 101(54)(58). The Debtor appears to argue that even if

TNE's security interest in the rents were perfected prior to the preference period pursuant to §§ 547(e)(1)(A), 547(e)(2)(A) or (B), the appointment of a receiver resulted in a transfer of the Debtor's property right to collect the rents.

In order to fully understand this argument, the treatment given to assignments of rents under New York law must be discussed.

As was already seen, rents are considered real property interests in New York State. Creation of a security interest in real property in New York does not transfer ownership of the real property to the mortgagee but rather creates a chose in action secured by a lien upon the land. A mortgage does not create an estate in the mortgagee. "The mortgagor remains the owner of the legal estate, and the mortgagee has only a special or personal interest therein as a security for the debt or obligation." N.Y.Jur.2d, *Mortgages,* § 147 (1989 and 1991 Supp.) (citations omitted). Furthermore, "[t]he right of a mortgagee to retain possession lawfully obtained is an incident of the debt and not an attribute of title." *Id.,* § 149.

The issue becomes more complicated when dealing with rents instead of land. It is not disputed that in this case the assignment of rents was not an absolute one but rather as an additional security. The case law distinguishes between these two different types of assignment. See, *In re Vienna Park Properties, L.P.,* 136 B.R. 43, 52 (S.D.N.Y.1992); *Federal Home Loan Mortgage Corp. v. Dutch Lane Assoc.,* 775 F.Supp. 133, 139 (S.D.N.Y.1991); *Federal Home Loan Mortgage Corp. v. Kopf,* 1991 U.S.Dist. Lexis 2881 (E.D.N.Y.1991). The nature of the right to rents that are subject to an assignment given as an additional security was not settled in New York for many years. The issue finally was resolved for what appears to be the first time in *Sullivan v. Rosson,* 223 N.Y. 217, 224, 119 N.E. 405 (1918) immediately followed by *In re Brose,* 254 F. 664 (2d Cir.1918):

The court [in *Sullivan v. Rosson* ] said that a mortgage of real property is but a pledge of property as security for a debt,

and that an assignment of rent of the character above-described is of the like character as the transfer of the real property, and that a mortgagee desiring to obtain such rents to apply upon his mortgage should actually possess himself of them or the right to them through some mutual arrangement therefor, or he should make application to the court to have the receivership extended to his benefit.

*In re Brose*, 254 F. at 667–8.

The court further held that "[t]he case clearly settles the law of New York upon this subject, and establishes the principle that such a clause in a New York mortgage as is herein involved operates merely as a pledge of the rents, to which the pledgee does not become entitled until he asserts his right." *In re Brose*, 254 F. at 668.

In *Vecchiarelli v. Garsal Realty, Inc.*, 111 Misc.2d 157, 158, 443 N.Y.S.2d 622 (1980) the court held that:

A mortgagee, even with an assignment of rents as additional security, is not entitled to rents and profits until he has reduced them to possession ... The senior mortgagee with a rent assignment has an equitable right to collect, but does not have legal title to rents automatically upon default.

The court also addressed the difference between an absolute assignment and an assignment as an additional security:

The rule was not applied in *Harris [v. Taylor*, 35 A.D. 462, 54 N.Y.S. 864 (1898) ] because unlike the situation here, the assignment was intended by the parties to be absolute, unqualified and immediately effective. That is to say, the assignment did not merely create a future right which would spring into being upon a later default.

*Vecchiarelli*, 111 Misc.2d at 159, 443 N.Y.S.2d 622. See also, *In re Hines*, 88 F.2d 423 (2d Cir.1937); *In re Vienna Park Properties, L.P.*, 136 B.R. 43 (S.D.N.Y. 1992); *In re Northport Marina Associates*, 136 B.R. 911 (Bankr.E.D.N.Y.1992); *In re White Plains Development Corp.*, 136 B.R. 93 (Bankr.S.D.N.Y.1992); *In re Flower City Nursing Home, Inc.*, 38 B.R. 642, 645 (Bankr.W.D.N.Y.1984); *In re Gaslight Village, Inc.*, 6 B.R. 871, 874 (Bankr. D.Conn.1980); *In re Pine Lake Village Apartment Co.*, 17 B.R. 829, 833 (Bankr. S.D.N.Y.1982).

Pursuant to New York law, therefore, an assignment of rent as an additional security is similar to a mortgage; even though a security interest may be perfected upon recordation, full enjoyment of the benefits of the security is not available until additional legal steps are undertaken. Just as a the holder of a properly recorded mortgage may not take possession and sell mortgaged property merely upon a default without a foreclosure and sale, so an assignee of rents as additional security may not receive those rents without the additional step of obtaining possession through the appointment of a receiver. Just as a subsequent encumbrancer of mortgaged property may enforce that encumbrance so long as such enforcement does not interfere with rights that the prior recorded mortgagee has elected to pursue, so may either the assignor or a subsequent assignee of rents for additional security pursue collection of those rents until a prior perfected assignee elects to pursue them by the appointment of a receiver to take possession of the property and collect the rents. See, *In re Brose*, 254 F. 664 (2d Cir.1918); *In re Hines*, 88 F.2d 423 (2d Cir.1937); *Sullivan v. Rosson*, 223 N.Y. 217, 119 N.E. 405 (1918); *Vecchiarelli v. Garsal Realty*, 111 Misc.2d 157, 443 N.Y.S.2d 622 (1980). In neither situation does the existence of an earlier perfected security impede the enforcement of the later perfected security unless and until the holder of the earlier perfected security manifests an election to pursue its security by taking the legal steps prerequisite to enforcement. And in both situations the commencement of enforcement of the later perfected security does not in any way impede the prior perfected security holder from making such election at any time.

■ Both the mortgage and the assignment of rent as additional security involve multiple transfers: one taking place at the time of the perfection of the security device

by establishing its priority; and another occurring upon the completion of the legal procedure upon which enforcement of the security is conditioned—the so-called "triggering event." See, e.g., *Durrett v. Washington National Insurance Co.*, 621 F.2d 201, 204 (5th Cir.1980); *Madrid v. Lawyers Title Insurance Corp.*, 725 F.2d 1197, 1204 (9th Cir.1984) (C.J. Farris, concurring); *Ehring v. Western Community Moneycenter (In re Ehring)*, 900 F.2d 184 (9th Cir.1990). Neither, however, involve preferentially avoidable transfers. In both situations the earlier transfer which creates the perfected security is for a contemporaneous consideration; and in both situations as a consequence of the existing security, the later transfer which effects enforcement cannot then provide the transferee with more than such creditor would receive in distribution under chapter 7 had the later transfer not been made. See, e.g., *In re Ehring*, 900 F.2d at 187; 11 U.S.C. §§ 506(a), (b), 724(b), 725.

■ Moreover, had the trustee in a chapter 7 case been interested in using the rents he or she would have been compelled to provide TNE with some type of adequate protection of its interest in the rents. The same applies to the Debtor herein since there is no doubt that the valid security interest held by TNE renders the rent cash collateral pursuant to 11 U.S.C. §§ 363(a), 552(b). See, *In re Vienna Park Properties, L.P.*, 136 B.R. 43 (S.D.N.Y.1992); *In re White Plains Development Corp.*, 137 B.R. 139 (Bankr.S.D.N.Y.1992); *In re Rancourt*, 123 B.R. 143 (Bankr.D.N.H. 1991); *In re Park at Dash Point, L.P.*, 121 B.R. 850 (Bankr.W.D.Wash.1990). The Debtor herein even entered into a cash collateral stipulation with TNE though it "reserve[d] the right to dispute TNE's interest in the cash collateral." Cash Coll. Stip at 2. Neither in its response to TNE's motion nor in its adversary complaint did the Debtor even argue that the rents are not cash collateral.

11 U.S.C. § 363(e) enables an entity that holds an interest in cash collateral to obtain adequate protection. As TNE correctly states it is entitled to adequate protection of two distinct interests: its mortgage on the property and its right to collect the rents flowing from the property or, at the very least, its security interest in such rents. TNE also correctly argues that the usual remedy of sequestration of rents and their limited use for expenses necessary to maintain the mortgaged property, see *United States Savings Assoc. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), may serve to adequately protect its security interest in the mortgaged property but would leave its security interest in the rents without any such protection. In order to be able to use the rents the Debtor must adequately protect TNE's interest in those rents. In light of the purposes inherent in adequate protection, the available methods for awarding it, 11 U.S.C. § 361, and the distribution of property to secured creditors in a chapter 7 case, 11 U.S.C. §§ 724(b), 725, we fail to see how the conditions set in § 547(b)(5) can be met.

We conclude, therefore, that the appointment of a receiver to collect rents in New York is not avoidable as a preferential transfer pursuant to 11 U.S.C. § 547(b).

III. *Avoidability of the Pre–Payment Charge*

The loan agreement between the parties provides for a pre-payment charge computed as follows:

"The present value, computed on a monthly basis as of the date of pre-payment, at the yield on the Treasury Bond as most recently reported in the Wall Street Journal (or a similar publication selected by lender) as of the date of pre-payment of (1) the monthly installments from the date of pre-payment to, but not including the maturity date; (2) plus the amount of interest and principal due on the maturity date pursuant to the terms of this note; (3) multiplied by a fraction, the numerator of which is the amount prepaid and the denominator of which is the unpaid principal sum as of the date of pre-payment; (4) less the amount paid;

(5) plus ... reasonable costs and expenses ..."

Debtor's Memo. in Opp., pp. 22–23.

The Debtor seeks disallowance of that portion of TNE's secured claim based on the pre-payment charge on two grounds: (i) The pre-payment charge is unenforceable since it was occasioned by TNE's acceleration of the debt; and (ii) The pre-payment charge clause is a penalty not allowable by either New York State law or 11 U.S.C. § 506(b). We reject both arguments.

■ (i) Debtor argues that "[t]he right to receive a pre-payment premium is not absolute even if contained in the terms of the mortgage note. The lender loses its right to a pre-payment premium when it elects to accelerate the debt." In support of its position the Debtor cites to *In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir.1984); *In re Planvest Equity Income Partners IV*, 94 B.R. 644 (Bankr.D.Az.1988); *3C Assoc. v. IC & LP Realty Co.*, 137 A.D.2d 439, 524 N.Y.S.2d 701 (1st Dept.1988); *Nutman Inc. v. Aetna Business Credit*, 453 N.Y.S.2d 586, 115 Misc.2d 168 (1982). We agree with TNE that these cases are not controlling herein.

It is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration. The cases cited by the Debtor do not appear to address this issue and none of them specifically hold that a contractual provision allowing collection of a pre-payment charge upon lender's acceleration is prohibited or void. The *LHD* court cites exceptions to the general rule that voluntary acceleration denies the lender the right to collect the charge, 726 F.2d at 331, and implies that the parties have the freedom to modify that general rule, 726 F.2d at 331 n. 5. The *3C Associates* court addressed a situation where "[t]he terms of paragraph 21 make clear that said sum is an obligation which becomes due and payable only if there is a *voluntary exercise* of the right to prepay." 524 N.Y.S.2d at 701–2 (emphasis added). The same is true of *Nutman v. Aetna Business Credit*, 453 N.Y.S.2d 586. The *Planvest* court, relying on *LHD*, does not

appear to prohibit such a provision: "prepayment penalty provisions are *generally* interpreted to mean that the penalty is allowed only where the pre-payment is voluntary." 94 B.R. at 644 (emphasis added).

Moreover, *United Merchants and Manufacturers, Inc. v. Equitable Life*, 674 F.2d 134 (2d Cir.1982) and *Parker Plaza West Partners v. UNUM Pension & Insurance*, 941 F.2d 349 (5th Cir.1991), *reh. denied*, serve fatal blows to Debtor's position. The *United Merchants* court, refusing to follow 14 N.Y.Jur.Damages § 167 (1969), conducted its own survey of New York law and enforced a loan agreement provision that entitled the lender to receive a pre-payment charge resulting from lender's acceleration of the note. 674 F.2d at 140. *Parker Plaza* squarely holds such a contractual provision to be valid, enforceable and not against public policy. Even though the case was decided under Texas law, we find its reasoning compelling and thus controlling herein. See, e.g., *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D.Ca.1987).

■ (ii) The real thrust of Debtor's argument in seeking to invalidate the pre-payment charge is that in light of the current market condition the formula chosen by the parties will result in a very large pre-payment charge. The Debtor argues that had the parties chosen an interest rate based upon mortgages of real property rather than upon United States Treasury Bonds, the pre-payment charge would have been considerably smaller. This argument is unpersuasive.

As set forth in *United Merchants*, "[w]hether a contract clause which nominally prescribes liquidated damages is in fact an unenforceable penalty provision is a question of state law." 674 F.2d at 141 (citations omitted). See, e.g., *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Citing to *Heller & Co. v. American Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir.1972), the *United Merchants* court held:

> Under New York law a contractually agreed upon sum for liquidated damages will be sustained where (1) actual dam-

ages may be difficult to determine and (2) the sum stipulated is not "plainly disproportionate" to the possible loss. 674 F.2d at 142. Furthermore, *United Merchants* conclusively held that "the soundness of such clause is tested in light of the circumstances existing *as of the time that the agreement is entered into* rather than at the time that the damages are incurred or become payable ... It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause." 674 F.2d at 142, citing to *Heller*, 459 F.2d at 898–9 (emphasis added). See also, *Hasset v. Revlon, Inc. (In re O.P.M. Leasing)*, 23 B.R. 104, 111 (Bankr.S.D.N.Y.1982). Indeed, the very purpose of such a clause is to avoid the hazard of unpredictability.

We believe that the transaction herein is squarely within the rationale of *United Merchants* and *Heller*. The transaction herein involved a loan in the principal amount of over $26,000,000.00 secured by a mortgage and an assignment of rents. The note signed by the borrower covers seven printed pages, while the mortgage and the security agreement take up 44 pages inclusive of exhibits. Furthermore, the Debtor holds a leasehold in the property but not title, since the property is titled to the County of Nassau which may terminate the lease upon Debtor's failure to meet its obligations to the County. We do not see any material fact that distinguishes the $45,-000,000.00 unsecured loan that was dealt with in *United Merchants* or the $9,000,-000.00 loan dealt with in *Heller* from the facts of this case. "Here the nature of the transaction and the amount involved in it convince us that an agreement for liquidated damages was appropriate." *Heller*, 459 F.2d at 899.

Relying on *In re A.J. Lane & Co.*, 113 B.R. 821 (Bankr.D.Mass.1990) the Debtor appears to argue that the first prong of the *United Merchants*' test is not met. The *A.J. Lane* court stated that "[t]he only substantial loss that can be incurred from pre-payment of a fixed interest [rate] loan, the reduction in interest income on re-loaning the funds, is easily proven." 113 B.R. at 829. Therefore, the court concluded,

such a pre-payment clause does not pass *United Merchants*' muster. We disagree.

First, even though it is not stated whether the loan in *United Merchants* was a fixed interest rate loan, the court acknowledged the existence of many unknown factors which result in great difficulty to determine possible actual damages: the loss upon pre-payment of all of the interest to which the lender is entitled; the cost and expenses of procuring a substitute borrower and the attendant risk and delay involved; the applicable rate of return; the duration of the loan and the risk involved in each specific transaction; the extent and realizability of the collateral; and "other obvious uncertainties inherent in this particular contract." *United Merchants*, 674 F.2d at 143–4. We believe that the *A.J. Lane* approach does not comply with the law in this Circuit and furthermore it is somewhat incomplete.

Second, in order to determine the amount of a pre-payment charge that should be allowed, the *A.J. Lane* court suggested the following:

> [T]he difference in the interest yield between the contract rate and the market rate at the time of prepayment, projected over the term of the loan and then discounted to arrive at present value.

*A.J. Lane*, 113 B.R. at 829.

It is obvious that this language does not set forth a mechanical formula such that everyone applying it will arrive at precisely the same result; but rather it is a general description of the factors to be included in a proper approach which at best may only provide an appropriate range within which a particular result may be considered appropriate. For example, the *A.J. Lane* court did not indicate the appropriate discount rate, which is at the heart of the dispute herein. We believe that while in general terms the formula agreed to by TNE and the Debtor comports with the general test suggested by the *A.J. Lane* court, the *A.J. Lane* test does not take into account all of the factors considered by the *United Merchants* and *Heller* courts, and thus, is not controlling in this Circuit.

Taking the *A.J. Lane* reasoning one step further, the Debtor argues that since the actual damages are easily ascertainable using a relatively simple formula, actual damages were not difficult to determine. As we have seen, the requirements of the *A.J. Lane* "formula" and the additional factors required in this Circuit are far from simple. The question remains though, does the mere existence of a workable formula mandate a conclusion that damages are easily determinable? We think not.

Slight differences in formulating similar formulas will, over long periods of time and when applied to large sums of money, result in pre-payment charges of great disparity. There is no one right formula. All that exists is a long line of contingencies and factors that may be taken into account. There is, and there should be, a wide spectrum of available formulas that are designed to estimate, in any specific case, the possible actual damages. Actual damages in complicated and sophisticated transactions do not lose their character as difficult to ascertain just because formulas may serve as a useful tool to estimate them.

The mere need for a formula, and the existence of different formulas used by different lenders show that the actual loss to be incurred "may be difficult to determine." *United Merchants*, 674 F.2d at 142; *New England Mutual Life Ins. Co. v. Stuzin*, 1990 WL 150065 at *4, 1990 U.S.Dist. Lexis 13137 at *11 (D.Mass.1990).

Addressing the second prong of the *United Merchants* test, the Debtor neither argued nor attempted to prove that the sum stipulated was plainly disproportionate to the possible loss viewed at the time the contract was entered into.

First, the contract provides for a formula to be used in computing the charge, not for a fixed sum. Second, the Debtor argued that viewed under the current economic climate the formula would provide the lender with a windfall. However, in making such an argument the Debtor is using impermissible hindsight. *United Merchants*, 674 F.2d at 142; *Heller*, 459 F.2d at 898–9.

*In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D.Cal.1982) squarely supports Debtor's position. However, we refuse to follow it. First, *Skyler Ridge* appears to limit the freedom of contract of the parties by replacing the parties judgment regarding the appropriate discount rate with the court's view of the appropriate discount rate. Second, the *Skyler Ridge* court did not follow the two-prong test required by New York law. Third, even were we to follow *Skyler Ridge*, we find it inapplicable to the facts of this case. The mortgaged property in *Skyler Ridge* was a *residential* apartment complex. 80 B.R. at 501. The property subject to TNE mortgage is a *commercial* one. Therefore while the *Skyler Ridge* court could have found some justification in its preference of applying the yield paid on first mortgages for *apartments* building construction loans, see 80 B.R. at 505, no such justification exists here. TNE argued that "[n]o first mortgage rate is published with respect to commercial loans and thus the standard the California court advocated is unworkable." TNE's Rep.Memo at 15. The Debtor did not refute that contention. Therefore it was incumbent on the Debtor to demonstrate why the yield on first mortgages on *residential* real-property is a more appropriate discount rate than the yield on Treasury Bonds with respect to a first mortgage on *commercial leasehold* interest. The Debtor did not even attempt such a showing.

There are additional important elements established by *United Merchants* and *Heller*, which mandate a ruling in favor of TNE.

Thus, when these factors are considered together with the fact that the sum arrived at was the product of an arms-length transaction between sophisticated businessmen ably represented by counsel, the sum stated for liquidated damages does not seem to be a sum plainly disproportionate to the possible loss.

*Heller*, 459 F.2d at 899; *United Merchants*, 674 F.2d at 142.

The magnitude of the loan transaction and quality and quantity of the loan documents leave little doubt that here we have an arms-length transaction between adequately represented sophisticated business-

men. See also, *New England Mutual Life Ins. Co. v. Stuzin,* 1990 WL 150065 at *4, 1990 U.S.Dist. Lexis 13137 at *11 (D.Mass. 1990). Under these circumstances we feel, as did the *United Merchants* and *Heller* courts, that it would be offensive to the basic notion of freedom of contract if the Debtor's argument were to prevail. Were we to accept Debtor's position we would be granting borrowers a license to gamble with lenders' money regarding the discount rate applicable to pre-payment charges, a gamble that can not fail: should the yield on Treasury Bonds go up, the Debtor honors the deal, if, however, the yield goes down, the Debtor moves to invalidate the pre-payment charge. Such a result offends our sense of fair play. See, *In re Castleton Assoc.,* 109 B.R. 347, 351 (Bankr. S.D.Ind.1989) "It is an attempt to soften the blow of a bad business judgment. The purpose of chapter 11, whether under the old Act or under the Bankruptcy Code has never been designed to absorb the consequences of risk taking."

Next, the Debtor argues that even if the pre-payment charge were valid under New York law, it should be avoided as being "unreasonable" pursuant to 11 U.S.C. § 506(b). It argues that § 506(b) establishes a federal standard independent and apart from the state standard. See, *A.J. Lane,* 113 B.R. at 823–825.

As the *A.J. Lane* court indicated, some courts have adopted the federal standard approach while some apply a dual, federal and state, standard approach. *A.J. Lane,* 113 B.R. at 825. The *A.J. Lane* court rejected the line of cases applying a dual approach and held that the only applicable standard is the federal standard of reasonableness. *A.J. Lane,* 113 B.R. at 825.

Upon examining the content of the federal test to be applied in order to determine the reasonableness of a charge, the *A.J. Lane* court adopted a formula similar to the one applied in New York. Although that court adopted the rule presented in § 2–718(1) of the Uniform Commercial Code and § 356(1) of the Restatement (Second) of Contracts, 113 B.R. at 828, both of which make reference to an amount that

"is reasonable in the light of the *anticipated or actual loss caused*" (emphasis added), the court also adopted Comment b to § 356:

Two factors combine in determining whether an amount is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent it approximates the actual loss that has resulted ... even though it may not approximate the loss that might have been anticipated ... *The amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract even though it may not approximate the actual loss.*

*A.J. Lane,* 113 B.R. at 828 (emphasis added). Therefore, even under the *A.J. Lane* standard, the magnitude of the actual damages is not relevant to a determination of the reasonableness of the prepayment.

The Debtor has failed to meet even the *A.J. Lane* test in another aspect.

The greater the difficulty either of proving that loss has occurred or of establishing its amount with certainty ... the easier it is to show that the amount fixed is reasonable.

*A.J. Lane,* 113 B.R. at 828, citing to Restatement (Second) of Contracts § 356 comment b (1981).

The Debtor has not attempted to establish the loss incurred by TNE, much less its magnitude. The Debtor bases its argument solely on the relationship between the size of the charge and the balance due. That is far short of what it was required to show even by *A.J. Lane.*

In light of the above we need not decide whether the enforceability of a pre-payment charge is subject to a federal standard or a dual state-federal standard. We note, however, that we are inclined to favor the dual state-federal standard for the following reasons:

First, the federal approach line of cases was developed in cases dealing with attorneys' fees. See, *Chase Manhattan v. Wonder Corporation,* 82 B.R. 186 (D.Conn.1988); *In re Hudson Shipbuilders Inc.,* 794 F.2d 1051 (5th Cir.1986); *Matter*

*of 268 Ltd.,* 789 F.2d 674 (9th Cir.1986); *Unsecured Creditors' Committee v. Walter Heller & Co.,* 768 F.2d 580 (4th Cir. 1985). The legislative history extensively analyzed in these decisions indicates Congress' intention to allow attorneys' fees and other charges even where state law does not. It does not, however, necessarily follow that when such a charge is allowed under both state and federal law, the state law standard for its allowance is preempted.

Second, bankruptcy courts have considerable experience in assessing the reasonableness of attorneys' fees. The bankruptcy court is required to approve the retention of attorneys and other professionals and to fix and approve their requested fees. See, 11 U.S.C. §§ 327, 328, 329, 330, 331, Fed.R.Bankr.P. 2014, 2016. The bankruptcy judge, therefore, should not have any difficulty in determining whether requested attorneys' fees are reasonable. The same may be true with respect to usual charges involved in common transactions. Whenever a transaction can be compared with similar transactions, there should be no difficulty in determining the reasonableness of the charges involved. This is not, however, such a case. Although the transaction involved herein is not unique, it is certainly not common and not easily equated with other large real estate loan transactions. We suggest that there is no uniform federal standard that can assist us in determining the reasonableness of the pre-payment charge herein. Therefore, the Debtor's approach rejects a proper, developed and familiar set of standards and advocates instead a vacuum; a vacuum that would be filled by non-uniform and inconsistent judge-made law.

Relying on *In re Kroh Bros.,* 88 B.R. 997, 1102 (Bankr.W.D.Mo.1988) and *Connecticut General Life Ins. Co. v. Schaumburg Hotel Owner, Ltd. (In re Schaumburg Hotel),* 97 B.R. 943, 954 (Bankr. N.D.Ill.1989) the Debtor argues that while a 10% pre-payment charge is reasonable, a 25% pre-payment charge is not.

In this case the Debtor owed TNE, as of September 30, 1991, the sum of $38,522,-267.65 consisting of $26,750,000.00 in principal, $6,670,643.04 as the pre-payment charge, and $5,101,624.61 in additional interest and late charges. The pre-payment charge represents therefore 24.9% of the principal amount due and 20.9% of the total balance consisting of principal and additional interest and late charges. While we agree that the prepayment charge is high, we do not agree that it is unreasonable.

New York State law as analyzed above provides for a fairly developed, elaborate and readily applicable method of determining the validity of pre-payment clauses. Inherent in the test applied in New York are notions of reasonableness. We do not believe that such a test should be completely ignored.

At best we are willing to view the "reasonable" standard of § 506(b) in the context of pre-payment clauses as a safety valve which must be used cautiously and sparingly as all discretionary powers that are not subject to close scrutiny and statutory standard. The situation justifying invocation of this power is not easily definable. There may be occasion where although the pre-payment charge may pass the *United Merchants* muster, the resulting actual charge may be so large and so unjust to the estate and its creditors, that it may be avoided based on § 506(b) reasonableness standard. We do not think, however, that this is such a case.

## CONCLUSIONS

1. While the appointment of a receiver to collect rents pursuant to a perfected assignment of rents is a triggering event regarding the secured party's rights to obtain the rents, it is not a perfection of the security interest and thus is not avoidable as preferential transfer pursuant to the exception to 11 U.S.C. § 547(c)(5).

2. Although the appointment of a receiver to collect rents pursuant to a prior perfected assignment of rents resulted in a "transfer", such transfer is not an avoidable transfer under 11 U.S.C. § 547(b).

3. The pre-payment charge is valid and enforceable both under New York law and 11 U.S.C. § 506(b).