**WEST RALEIGH GROUP, a North Carolina general partnership,**
**Plaintiff,**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,**
**Defendant.**

**No. 92–343–CIV–5–F.**

United States District Court, E.D. North Carolina, Raleigh Division.

Nov. 6, 1992.

Charles Nichols, Raleigh, NC, for plaintiff.

Larry B. Sitton, E. Garrett Walker, Paul K. Sun, Jr., Smith, Helms, Mulliss & Moore, Greensboro, NC, for defendant.

## ORDER

JAMES C. FOX, Chief Judge.

This matter is before the court on defendant's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., filed July 13, 1992. Plaintiff has responded in opposition thereto, and defendant has filed a reply. The matter is ripe for disposition.

## I. NATURE OF THE CASE

Plaintiff, West Raleigh Group ("WRG") filed this diversity action seeking a declaration that certain prepayment provisions contained in a Note executed in connection with a $2,800,000 commercial real estate loan made to WRG by defendant, Massachusetts Mutual Life Insurance Co. (MassMutual), are unenforceable. WRG seeks to prepay the loan without paying the prepayment premium contemplated by the terms of the Note. WRG also asserts a right to damages based on MassMutual's refusal to accept a tendered prepayment of the loan that did not include the prepayment premium.

## II. STATEMENT OF FACTS

As alleged in the complaint, WRG, a North Carolina general partnership, entered into a loan agreement with Mass-Mutual, a Massachusetts mutual life insurance company. On February 26, 1985, WRG executed a promissory note in the principal sum of $2,800,000 (the "Note"), and MassMutual loaned that amount to the partnership. To secure the loan, WRG executed a deed of trust in favor of MassMutual (the "Deed of Trust") conveying WRG's principal asset, a medical office building.

Pursuant to the Note, WRG agrees to pay interest on the outstanding principal balance of the loan at a fixed rate of 13.-375% per annum over a 15–year loan term. Under the Note, the loan term extends to March 1, 2000, at which time the entire unpaid balance becomes due and payable. The Note does not permit MassMutual to increase its interest rate during the loan term absent a transfer of the security property.

The Note includes express provisions governing the prepayment of the loan during the 15–year loan term. Pursuant to these provisions, WRG agrees that it would have no right to prepay the loan for the first five years. After that time, however, MassMutual permits WRG to prepay the loan balance subject to the payment of an agreed-upon prepayment premium. Specifically, WRG agrees in the Note that as "consideration" for the prepayment option accorded it by MassMutual, it would, upon exercise of that prepayment option, pay, in addition to all outstanding principal and interest then due, a prepayment premium determined by multiplying the amount prepaid times the difference between the interest rate on the loan (13.375%) and specified United States Treasury yields.

Almost seven years after the original loan closing and at a time when then-available commercial real estate mortgage interest rates were substantially lower than the interest rates applicable under the terms of the Note, WRG in January 1992, advised MassMutual of its intent to exercise its privilege to prepay the loan. In its notice of the exercise of its prepayment option, however, WRG informed MassMutual that it did not intend to pay to Mass Mutual the prepayment premium specified in the Note. WRG contended then, as it does now, that the contractual provisions governing prepayment of the loan are unenforceable and void.

When MassMutual rejected WRG's contentions, WRG tendered to MassMutual in an attempted prepayment of the loan an amount equal to the outstanding principal and accrued interest under the Note. The tendered amount did not include the prepayment premium required under the terms of the Note, and MassMutual, therefore, refused the tendered payment.

Thereafter, on May 11, 1992, WRG instituted this action seeking a declaration that the agreed upon Note provisions creating WRG's prepayment privilege are unenforceable under North Carolina law, at least to the extent that those provisions require the payment of a prepayment premium. WRG asserts that because of this alleged unenforceability, it now is entitled to prepay the loan without any prepayment fee or charge. WRG alleges that the prepayment provisions create an "unenforceable penalty" because the prepayment provisions: (i) are designed and calculated to compensate MassMutual in an amount "wholly disproportionate" to probable losses arising from prepayment; (ii) are "unreasonable;" and (iii) "unfairly and unjustly" penalize it.[1]

On those grounds, WRG asserts that it is entitled to a declaration that the prepayment provisions in the Note are unenforceable. WRG also asserts a right to damages in the amount its contractual interest payments to MassMutual exceed the amount it would pay if its interest rate was 9.5%, and it asserts a claim for damages that may arise if it loses a loan commitment to refinance the loan at a 9.5% interest rate.

## III. ANALYSIS

WRG's various claims all rest upon the resolution of one underlying question: whether the agreed-upon prepayment provisions of the Note enforceable under applicable law. If these provisions are enforceable, then WRG is not entitled to the declaration it seeks and it is not entitled to the damages it demands.

North Carolina law controls the question of the validity and enforceability of the Note.[2] The court concludes that, under applicable North Carolina law, the prepay-

---

**1.** According to WRG's calculations, on April 10, 1992—more than seven years after the 15 year Note was signed—the prepayment penalty rate was 48.2%. WRG explains that this means that MassMutual was requiring more than $4 million to pay off the approximately $2.7 million left on the Note.

**2.** Applying the law of the forum state, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the law of the state where the contract was made—in this case North Carolina—controls questions of contract construction and interpretation. *Fried v. North River Ins. Co.,* 710 F.2d 1022, 1024 (4th Cir. 1983). WRG alleges in its Complaint that the Note was made in North Carolina.

ment provisions of the Note are valid and enforceable. This conclusion is compelled for several reasons. First, a North Carolina statute, first effective in 1969 and which is directly applicable to the Note, permits, subject to limited exceptions not relevant here, "*any* lender and *any* borrower to agree upon *any* terms as to prepayment of a loan." N.C.Gen.Stat. § 24–10(b) (1991) (emphasis added). Secondly, this statute is consistent with various other North Carolina statutes dealing with permissible interest rates and other fees in connection with large commercial real estate loans—statutes which permit the parties to such loans to agree upon such terms as they find mutually acceptable. Thirdly, North Carolina case law supports the conclusion that prepayment provisions of a large commercial loan such as the one in question here, are valid and enforceable and that such provisions, even in the absence of applicable statutes, are not liquidated damages provisions subject to analysis as such.

Under applicable North Carolina law, WRG has not stated a claim upon which relief can be granted. Fed.R.Civ. 12(b)(6); *see First Financial Savings Bank, Inc. v. American Bankers Ins. Co. of Fla., Inc.,* 699 F.Supp. 1158, 1161 (E.D.N.C.1988).

### A. *The Business Purposes of Prepayment Provisions and Premiums*

Before examining applicable North Carolina statutes and case law, it is useful to examine the purposes sought to be achieved by borrowers and lenders in negotiating prepayment provisions. In negotiating commercial real estate loans, borrowers generally seek to obtain long term funds to finance investments in real estate projects in which the borrowers are interested. Borrowers seek loans in such amounts, at such interest rates and for such time periods as are necessary to make their real estate projects attractive investments for them.

A borrower may seek short term or long term financing. In short term loans there is little risk that interest rates will fluctuate during the loan term and, in addition,

short term loans generally contain variable interest rate provisions. This is not, however, true of long term loans. Because of the concern for interest rate fluctuations, the longer the loan term, the higher the interest rate required by the lender and the marketplace. If the loan is a fixed rate loan with a long loan term, the lender is implicitly agreeing to take the risk that interest rates will increase during the loan term. In such loans, that interest rate risk is allocated to the lender thereby protecting the borrower from rising interest rates. If interest rates do in fact increase during the loan term above the fixed interest rate on the loan, the lender, absent a call provision, cannot call the loan and re-loan the funds higher rates. The lender must abide by the loan agreement it made and forego the additional return it could earn if it could call the loan and re-loan the funds at the then higher rates.

As part of this same negotiation process, a lender making a long term fixed interest rate commercial mortgage loan will seek to obtain the borrower's agreement that the loan will not be prepayable during the loan term or that, if it is to be prepayable, the prepayment option can only be exercised upon the payment to the lender of a prepayment premium. In this way, the lender seeks to allocate to the borrower some of the risk that interest rates will decline during the loan term. If interest rates do decline during the loan term, the borrower is expected to also abide by its agreement and forego the increased return on its real estate investment that lower loan rates would permit, just as the lender must abide by its agreement if the rates go up and to forego the higher returns that could be obtained if the loan funds were available to be re-loaned.

Thus, prepayment provisions, like fixed-interest rate provisions and loan duration provisions, are designed to allocate the risk of interest rate increases and decreases during the loan term. With a fixed interest rate for a long term, the borrower can safely and with certainty make its envisioned real estate investment without concern about the possibility of higher rates.

The risk of losing higher yields of interest rates rests with the lender. With such a loan in place the borrower will reap from its real estate investment the return it has envisioned at the time of the loan closing regardless of subsequent interest rate increases.

Similarly, with a fixed-rate long term mortgage containing prepayment restrictions or premiums, the lender can invest its funds in the loan without undue concern for subsequent interest rate declines. The risk of lower interest rates resides with the borrower. Based upon such a loan investment, the lender may, in turn, raise funds to lend and commit to pay certain interest rates, whether through certificates of deposit, annuities, insurance contracts, guaranteed yield contracts, or other products, with protection against subsequent interest rate declines. Through the use of prepayment prohibitions and premiums, a lender can thus protect its stream of income from its loan assets and, with that protection, can then match the interest rates earned on its loan assets with the long term interest rates it must pay on its liabilities. *See generally* Stark, "New Developments in Enforcing Prepayment Charges After Acceleration of a Mortgage Loan," 26 *Real Prop., Prob., & Trust J.* 213 (1991).

In this way, prepayment restrictions and premiums are simply loan terms and loan features that function in much the same manner as fixed interest rate provisions, loan duration provisions and other provisions defining the economic bargain struck by the parties. As such, prepayment restrictions and premium provisions serve legitimate business purposes important to both borrowers and lenders. These functions and purposes support the wide latitude accorded commercial borrowers and lenders under North Carolina law freely to negotiate and bargain upon prepayment provisions and premiums, as discussed below.

### B. Prepayment Provisions are Valid Under N.C.Gen.Stat. § 24–10(b)

The North Carolina General Assembly has elected not to limit prepayment restrictions and premiums in commercial real estate loans in excess of $100,000, and has specified that the parties to such loan agreements may agree upon *any* prepayment terms they desire.

Section 24–10(b) of the North Carolina General Statutes provides:

> (b) Any loan made under G.S. 24–1.1 *in an original principal amount of one hundred thousand dollars ($100,000.00) or less* may be prepaid in part or in full, after 30 days notice to the lender, with a maximum prepayment fee of two percent (2%) of the outstanding balance at any time within three years after the first payment of principal and thereafter there shall be no prepayment fee, provided that there shall be no prepayment fee charged or received in connection with any repayment of a construction loan; *and except as herein provided, any* lender and *any* borrower may agree on *any* terms as to the prepayment of the loan.

(Emphasis added). With such clear and unambiguous language, the only issues presented are whether this statute is applicable to the prepayment terms under review and whether the statute mean what it says.

This statute in its present form was first enacted in 1969 and became effective on July 2, 1969. 1969 N.C.Sess.Laws Ch. 1303 § 6. The statute was in effect on February 26, 1985—the date the Note was executed. The Note amount is in excess of $100,000 and it is not alleged that the loan was a "construction loan." There can be no serious argument that WRG and Mass-Mutual did not agree upon the contested prepayment provisions, since those provisions are expressly a part of the Note. Accordingly, the court concludes that N.C.Gen.Stat. § 24–10(b) is applicable to the Note and that the enforceability of the prepayment terms of the Note is governed by it.

Furthermore, the court deems the language of the statute clear and unambiguous: it provides that *any* lender and *any* borrower may agree upon *any* terms as to prepayment of a loan. It does *not* provide that the parties may agree upon prepay-

ment terms so long as those terms do not require premiums that are "wholly disproportionate to probable losses arising from prepayment," or so long as those terms do not demand "unreasonable" prepayment premiums, or so long as those terms do not provide for prepayment premiums which "unfairly and unjustly penalize" the borrower. Under North Carolina law, the General Assembly establishes public policy, and "[w]hen the language of a statute is clear and unambiguous, it must be given effect...." *State ex rel. Utilities Comm'n v. Edmisten,* 291 N.C. 451, 232 S.E.2d 184, 192 (1977).

The wisdom of the North Carolina statute, and others like it, is manifest. First, the statute preserves freedom of contract, a principle long recognized and jealously guarded in North Carolina. *See, e.g., Clark v. Butts,* 240 N.C. 709, 83 S.E.2d 885, 889 (1954). Secondly, the statute recognizes that borrowers and lenders are best able in a free market place to determine for themselves what prepayment terms are acceptable, "reasonable," "proportionate," and "fair." A court trying to determine whether a prepayment premium provisions is "unreasonable," "disproportionate," or "unfair" would have no more basis for making such a determination in any given loan context than it would of determining whether the agreed upon interest rate or the agreed upon loan term or the agreed upon loan amount or repayment provisions were "reasonable," "fair," or "proportionate." The North Carolina statute recognizes that prepayment provisions are part and parcel of the overall loan terms and, as such, are better left to the agreement of the parties.

For these reasons, § 24–10(b) permits borrowers and lenders in large commercial loans, presumptively sophisticated and of comparable bargaining power, to agree as they choose with respect to prepayment provisions. Furthermore, in such loan transactions, borrowers may choose from among numerous lenders with whom to deal. If a particular lender's prepayment terms are unacceptable, the borrower simply may choose to deal with another lender. Therefore, under this statute, the prepay-

ment provisions of the Note are valid and enforceable even if such provisions would result in the significant prepayment premium alleged by WRG.

C. *North Carolina's Usury Laws Evince a Legislative Intent to Permit Parties to Make Their Own Bargains in Substantial Commercial Loan Transactions*

■ Under North Carolina's statutory scheme, the proposition that, in large commercial real estate loans any borrower may agree with any lender upon any prepayment terms, is consistent with the General Assembly's approach to other terms of large commercial loan transactions. Under applicable North Carolina statutes, usury rate, permissible loan fees, and permissible prepayment provisions are regulated or not regulated depending primarily upon the size of the loan. This is true for both commercial real estate loans as well as residential "home" loans.

For example, § 24–1.1(a)(1)—North Carolina's basic usury statute—provides that in commercial loans of $25,000 or less, the parties may contract for interest not to exceed the greater of 16% per annum or such rate as is announced from time to time by the Commissioner of Banks. The same statute, however, provides that in commercial loans in excess of $25,000 the parties may agree to pay interest "at any rate agreed upon by the parties." N.C.Gen.Stat. § 24–1.1(a)(2). In other words, North Carolina limits the permissible interest rates on small commercial loans but does not restrict the maximum interest rates that may be charged on larger loans. With respect to such larger commercial loans the parties are free to bargain for any rate, whether fixed or variable, upon which they agree. They are not limited to a "reasonable" rate or a "fair" rate. Similarly, the permissible interest rates on "home loans" are unlimited for loans of $10,000 or more regardless of who the lender is, while the permissible rates on "home" loans of less than $10,000 are restricted unless made by a qualified lender. N.C.Gen.Stat. § 24–1.1A(a).

This same small loan/large loan approach is reflected in N.C.Gen.Stat. § 24-10(b) with respect to prepayment provisions. As shown, under that statute prepayment premiums on commercial loans of $100,000 or less are restricted; there are no restrictions on prepayment provisions with respect to commercial loans in excess of that amount. This approach also is taken with respect to prepayment provisions in "home" loans. Accordingly, § 24-1.1A(b) precludes prepayment fees on "home" loans of $100,000 or less, but provides that on "home" loans over $100,000, a "lender and a borrower may agree on any terms as to the prepayment of a home loan."

Furthermore, §§ 24-1.1(d) and (e) establish certain maximum fees that may be charged in connection with certain loan modifications and loan originations, but subsection (f) of that statute provides that those subsections shall not be construed to limit fees on loans and extensions of credit in excess of $300,000. Similarly, N.C.Gen. Stat. § 24-8 limits permissible loan fees and charges on loans not in excess of $300,000 to such interest rates and fees as are expressly permitted by Chapter 24 of the General Statutes. There is no comparable limitation for loans in excess of $300,000.

These statutory provisions evidence a clear intent of the North Carolina legislature. In a substantial loan transaction, especially a large commercial real estate loan such as the one *sub judice*, the parties are, under North Carolina law, free to agree upon their own loan terms including their own interest rates, loan fees, and prepayment provisions. The North Carolina General Assembly has recognized that in substantial loan transactions, the parties are sophisticated and presumptively able, themselves or through legal counsel, to negotiate for terms they deem mutually satisfactory without interference from either the legislature or the courts.

In the present case, WRG and Mass-Mutual were, under North Carolina law, free without restriction to agree upon any interest rate, any loan fees, and any terms of prepayment they chose. The parties agreed to the prepayment terms set out in the Note just as they did to the interest rate and loan term provided therein. WRG has asserted no basis upon which it is entitled to avoid its contractual prepayment obligations and to avoid the prepayment agreement it freely made. It has, at most, asserted only that because interest rates have now declined, it is "unfair" to require it to abide by the prepayment agreement it made and that to require it to pay the agreed-upon prepayment premium in order to take advantage of the lower rates "unjustly penalizes" it. However, had interest rates increased, WRG would undoubtedly not be before the court.

■ Under North Carolina law the freedom to contract cuts both ways. In North Carolina, fixed interest rate and prepayment provisions are enforceable by and against both lenders and borrowers in accordance with their terms in both rising and declining interest rate environments. To hold that fixed interest rate provisions are binding against lenders in rising interest rate markets and to permit borrowers to void prepayment restrictions and premiums in declining markets would be unjust and inequitable. This is, however, precisely the result WRG is seeking in the present case. WRG's attempts to void the prepayment provisions so that it may increase its return on its real estate investment by taking advantage of lower interest rates is rejected and the agreed-upon prepayment provisions are upheld.

D. *The Prepayment Provision is an Enforceable Contract Term, Not an Illegal Penalty*

■ WRG asserts that the prepayment provision in the promissory note is unenforceable because it is disproportionate, unreasonable, and unfair. It relies on the characterization of the payment required under the terms of the promissory note as a "penalty" to import into this case analysis familiar to the determination of whether a liquidated damages provision is unenforceable as a penalty. *See, e.g., Knutton v. Cofield,* 273 N.C. 355, 160 S.E.2d 29, 34 (1968) (whether stipulated sum is "reasonable" estimate of probable damages or

"reasonably proportionate" to actual damages impacts determination whether it will be treated as an enforceable liquidated damage clause or as an unenforceable penalty). WRG's reliance on this analysis is misplaced. WRG cannot state a claim for relief under North Carolina law based on allegations that the prepayment provision is disproportionate, unreasonable, and unfair when it voluntarily and unilaterally has sought to invoke the privilege of prepayment because it now believes that it can refinance its indebtedness at a lower interest rate.

■ First, WRG's emphasis on the characterization of the payment required in the Note as a "penalty" raises no question as to the enforceability of the prepayment provisions. The fact that the language of the Note calls the prepayment premium a "penalty" is not determinative of its enforceability. Surely the parties intended to bargain for an enforceable "penalty" and not one that would be void. In any event, under N.C.Gen.Stat. § 24–10(b) and North Carolina case law, the labelling of the prepayment premium as a prepayment penalty is not controlling. *See Hatcher v. Rose,* 329 N.C. 626, 407 S.E.2d 172, 174 (1991) (discussing *Bell Bakeries, Inc. v. Jefferson Standard Life Ins. Co.,* 245 N.C. 408, 96 S.E.2d 408 (1957), enforcement of "penalty for prepayment").

More fundamentally, WRG's claims depend on its unstated premise that the prepayment provision is intended to be a liquidated damages provision, and thus is subject to challenge as an illegal "penalty." WRG's implicit premise, however, ignores the fact that there has been no breach of contract in this case; rather, WRG is attempting to voluntarily invoke a contract term—the privilege and option of prepayment. Therefore, to invoke that option it must abide by the terms of its agreement. The prepayment penalty or premium is the bargained-for consideration for the option to prepay, and as such it is enforceable as a matter of contract law and not as a measure of damages. As discussed below, North Carolina law uniformly holds that the liquidated damages analysis WRG im-· plicitly relies on is inapplicable in such a case.

*Brenner v. Little Red School House, Ltd.,* 302 N.C. 207, 274 S.E.2d 206 (1981), is illustrative. In *Brenner,* the plaintiff sought a refund of prepaid tuition when his son could not attend the school. A provision in the parties' contract made the tuition non-refundable. The plaintiff argued that this contract clause was an unenforceable penalty rather than an enforceable provision for liquidated damages. The Supreme Court rejected the plaintiff's analytic approach and upheld the contract provision, stating:

> [P]laintiff's argument ignores the fact that there has been no breach of contract in this case.... The non-refundable tuition provision was simply one term of the contract, not a measure of recovery in the event of a breach, thus the law of damages has no bearing upon this case.

*Id.* 274 S.E.2d at 211.

In reaching this conclusion, the *Brenner* court relied on North Carolina precedent making liquidated damages analysis applicable only in the event of a breach of the underlying contract. *E.g., Knutton v. Cofield,* 160 S.E.2d at 34 (liquidated damages is sum " 'payable as compensation for injuries in the event of a breach' ") (quoting 22 Am.Jur.2d *Damages* § 212); *accord Ledbetter Bros., Inc. v. North Carolina Dept. of Transp.,* 68 N.C.App. 97, 314 S.E.2d 761, 767 (1984).

■ In this case, WRG voluntarily has sought to invoke the agreed-upon option to prepay. The provision governing this prepayment option sets forth the consideration MassMutual bargained for, and WRG agreed to pay, should WRG desire to exercise its option to prepay the loan. The prepayment premium therefore is "simply one term of the contract." WRG has not defaulted under the Note and MassMutual is not compelling WRG to prepay. A liquidated damages analysis is not an appropriate analysis of the prepayment option provisions. Instead, as a matter of basic contract law, MassMutual is entitled to enforce the prepayment provisions if WRG exercises the contractual option to prepay. *See Bell Bakeries,* 96 S.E.2d at 415–16.

392

## IV. CONCLUSION

In 1985, WRG entered into a large, long term real estate loan agreement with Mass-Mutual that provided for a fixed rate of interest. Under that loan agreement, WRG was accorded the option and privilege to prepay the loan after five years. However, WRG agreed to pay a prepayment premium if it exercised its prepayment option. Through these provisions the risk of rising interest rates was allocated to Mass-Mutual and the risk of falling interest rates was allocated to WRG.

Interest rates have declined in the seven years since the loan closing. For that reason WRG now seeks to avoid the prepayment provisions to which it agreed on the basis that such provisions are disproportionate, unreasonable and unfair. For the reasons reviewed above, this court must apply the controlling North Carolina statute, reject WRG's contentions, and hold WRG to the bargain it freely made. To do otherwise would undermine the freedom of contract and would unjustly prevent lenders from protecting their loan income streams by agreeing with borrowers that the risk of falling interest rates would be allocated to them. Therefore, MassMutual's 12(b)(6) Motion to Dismiss is ALLOWED for WRG's failure to state a claim upon which relief may be granted.

SO ORDERED.