635 A.2d 366

**CARLYLE APARTMENTS JOINT VENTURE, etc.**

v.

**AIG LIFE INSURANCE CO.**

Misc. No. 13, Sept. Term, 1993.

Court of Appeals of Maryland.

Jan. 10, 1994.

John E. Schwarz (Dwight D. Meier, Jerald Pasternak, Ginsburg, Feldman and Bress, Chartered) on brief, Washington, DC, for appellant.

James H. Hulme (Arent Fox Kintner Plotkin & Kahn) on brief, Bethesda, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE *, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This is a certified question case.[1] A mortgagor, as part of a refinancing, voluntarily prepaid a commercial loan in accordance with its terms. The mortgagor now seeks to recover the agreed prepayment fee by arguing that (1) the mortgagor's performance of the contract should be treated as a breach of contract, (2) the prepayment fee should be treated as liquidated damages, and (3) the prepayment fee is void as a penalty. We do not accept the first step in the mortgagor's argument. Consequently, we do not reach the remaining steps.

Appellant, Carlyle Apartments Joint Venture (Carlyle), owns an apartment complex in Crofton, Anne Arundel County, Maryland. In January 1991, Carlyle borrowed $3,100,000 from the appellee, AIG Life Insurance Co. (AIG), evidenced by a note and secured by a first Deed of Trust on the property. The debt bore 10.25% per annum interest, was payable in monthly payments of $28,800, and would mature January 1, 1996, when a balloon payment would be due.

The loan documents permitted Carlyle to prepay the entire outstanding indebtedness at any time on or after February 1, 1992, for a fee. Section 9.1 of the note, in relevant part, provides:

"The Borrower is granted the privilege to prepay this Note in whole but not in part at any time on or after, but not before, February 1, 1992, and not after October 1, 1995. . . .

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. The matter comes to us from the United States District Court for the District of Maryland, pursuant to the Maryland Uniform Certification of Questions of Law Act, Md.Code (1974, 1989 Repl.Vol.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article.

Any such prepayment shall be made on a payment date, at a prepayment price equal to the then outstanding balance of the Principal Sum, together with unpaid interest thereon accrued to the date fixed for prepayment, plus any other sums then due and payable to the Holder and accompanied by a prepayment fee equal to the difference in yield between the Loan as defined in the Deed of Trust (as hereinafter defined) and a Treasury Note in the amount of the prepayment proceeds with a term equal to the remaining term of the Loan. Such method of computation as aforesaid is hereinafter referred to as the 'Treasury Note Yield.' If prepayment is made pursuant to this Section 9, then the remaining term of the Loan shall be the length of time between the prepayment date and the maturity date of the Loan.... If on the date of any prepayment, the Treasury Note Yield is equal to or greater than the interest rate then payable under this Note, no prepayment premium will be due and payable by the Borrower with respect to such prepayment. The calculation of the Treasury Note Yield will be determined by reference to the yield quoted in the Federal Reserve Weekly Release H.15 (519) of Selected Interest Rates (or any similar successor publication of the Federal Reserve) for the first week ending not less than two full weeks prior to the prepayment date. If the remaining Loan term is less than one year, the Treasury Note Yield will equal the yield for 1–Year Treasury Constant Maturities. If the remaining Loan term is equal to one of the maturities of the Treasury Constant Maturities (*e.g.*, 1–year, 2–year, etc.), then the Treasury Note Yield will equal the yield for the Treasury Constant Maturity with a maturity equalling the remaining Loan term. If the remaining Loan term is longer than one year but does not equal one of the maturities of the Treasury Constant Maturities, then the Treasury Note Yield will be based on an interpolation of the yield on Treasury Notes having the next longer and the next shorter term."

Five other paragraphs of § 9 also address prepayment. If acceleration of maturity of the note, after an event of default,

occurred prior to February 1, 1992, Carlyle agreed in § 9.2 to pay a prepayment premium of one percent of the outstanding balance of principal plus the "Treasury Note Yield." Section 9.3 provides that the prepayment fee "shall be due and payable whether such prepayment is voluntary or involuntary, including but not limited to repayment resulting from a default and the acceleration of the indebtedness...." No prepayment premium, however, would be due "to the extent the Holder applies the proceeds from a Condemnation or Casualty ... to repayment," per § 9.4. Under § 9.6 there would be no prepayment premium if, upon thirty days' prior written notice, Carlyle prepaid in full within ninety days preceding the maturity date of the loan.

This action commenced on January 28, 1993, when Carlyle, in anticipation of prepaying, filed a state court complaint seeking a declaration voiding the prepayment fee provision. AIG removed the case to federal court. Subsequently AIG moved for judgment on the pleadings.

AIG's threshold position was that there is no right under Maryland law to prepay a mortgage, absent a statute or contract term so providing. As a matter of bargaining Carlyle had obtained an option to prepay, for the exercise of which it had promised to pay the prepayment fee. AIG simply refused to relinquish its contractual rights. Carlyle agreed that there is no prepayment right as a matter of Maryland common law. The borrower asserted that "in the absence of a clause permitting prepayment, prepayment has traditionally been regarded as a breach of the loan agreement." Record Extract at 46–47. From this Carlyle concluded that, to the extent that a loan agreement does not freely permit prepayment, but instead provides for a prepayment fee, the fee must be evaluated under liquidated damages standards.

While AIG's motion was pending, Carlyle, on May 28, 1993, prepaid the full amount owing under the note and paid the full prepayment fee, calculated according to the formula in § 9.1 of the note. Carlyle paid the fee "under protest and with full reservation of all rights...." Brief of Appellant at 5 n. 3.

This prepayment was part of a refinancing of the indebtedness on the apartment property.[2]

In response to AIG's motion for judgment, the federal court concluded that "no Maryland court has spoken . . . concerning the substantive issues involved in this case" and certified the following questions to this Court:

"[1]  Are the prepayment provisions of the note involved in this case valid and enforceable, *per se?*

"[2]  Or, are the said provisions of the said note valid and enforceable only if they meet standards such as those which prevail under Maryland law in connection with the enforcement of liquidated damage clauses?

"[3]  If such prepayment provisions are valid and enforceable only if they meet standards of the type described in Question 2, what are the standards which are prescribed under Maryland law?"

The certification also disclaims restricting this Court's consideration by the phraseology of the questions.

The first and second questions raise one basic issue and may be merged. That issue is whether this prepayment fee provision is subject to the legal rules governing the validity of liquidated damages clauses in contracts.

Our analysis begins with the rule that

"under Maryland common law, a mortgagor or grantor under a deed of trust payable at a fixed date or dates in the future, does not have a right to prepay, absent provision for prepayment in the loan contract. Phrased another way, there is no presumption of prepayment which must be negated by express contract provision in order to prevent prepayment."

---

2. The apparent purpose of the refinancing was for Carlyle to take advantage of declining interest rates. To illustrate its argument, Carlyle has furnished a calculation of a payoff as of April 30, 1993, requested by Carlyle and computed by AIG in early March, which reflects that the "Treasury Note Yield" would be 4.136%. Carlyle also points out, in an argument illustration, that "the FHFB Nat'l Mortgage Contract Rate for March 5, 1993" was approximately 7.49%.

*Promenade Towers Mutual Housing Corp. v. Metropolitan Life Ins. Co.*, 324 Md. 588, 603–04, 597 A.2d 1377, 1384 (1991). That is the majority rule in this country. *Id.* at 592–94, 597 A.2d at 1379–80.

The loan contract in the case before us creates a borrower's prepayment privilege, but it is not unlimited. Prepayment must be of the entire principal balance, accompanied by the calculable prepayment fee under § 9.1 of the note. The only legal theory advanced by Carlyle to support judicial invalidation of the prepayment provision and a judgment for refund to Carlyle of the prepayment premium is that, under the Maryland law of liquidated damages, the prepayment fee is a penalty and is invalid. But the loan contract between Carlyle and AIG permits prepayment under circumstances with which Carlyle complied. Carlyle did not breach the contract— Carlyle performed in accordance with its terms. These facts do not engage the gears of the Maryland law relating to liquidated damages.

*West Raleigh Group v. Massachusetts Mutual Life Ins. Co.*, 809 F.Supp. 384 (E.D.N.C.1992), is on point. Seven years into the fifteen year term of a mortgage loan carrying interest at 13.375% per annum, the borrower sought voluntarily to prepay without paying the prepayment premium, the calculation of which used as a factor the difference between the loan contract rate of interest and specified yields on United States Treasury obligations. The borrower brought a declaratory judgment action contending that the prepayment provision created an unenforceable penalty because it would compensate the lender "in an amount 'wholly disproportionate' to probable losses arising from the prepayment." *Id.* at 386. The court rejected this contention on a number of independent grounds. One ground invoked a very basic analysis with which we are in complete accord. The court said:

> "More fundamentally, [the borrower's] claims depend on its unstated premise that the prepayment provision is intended to be a liquidated damages provision, and thus is subject to challenge as an illegal 'penalty.' [The borrower's] implicit premise, however, ignores the fact that there has

been no breach of contract in this case; rather, [the borrower] is attempting to voluntarily invoke a contract term—the privilege and option of prepayment. Therefore, to invoke that option it must abide by the terms of its agreement. The prepayment penalty or premium is the bargained—for consideration for the option to prepay, and as such it is enforceable as a matter of contract law and not as a measure of damages."

*Id.* at 391.

Carlyle would have us distinguish *West Raleigh Group* from the instant matter because the court in that case also analyzed the issue in relation to certain North Carolina statutes. The opinion in *West Raleigh Group*, however, on its face defeats Carlyle's attempt to distinguish. The court, summarizing the above-stated reason for its conclusion, said:

"North Carolina case law supports the conclusion that prepayment provisions of a large commercial loan such as the one in question here, are valid and enforceable and that such provisions, even in the absence of applicable statutes, are not liquidated damages provisions subject to analysis as such."

*Id.* at 387.

An analysis similar to that which we apply here and to that applied in *West Raleigh Group* is found in *Lazzareschi Investment Co. v. San Francisco Fed. Savings & Loan Ass'n,* 22 Cal.App.3d 303, 99 Cal.Rptr. 417 (1971). The reported case grew out of a divorce action. In order to pay obligations due from husband to wife, the court appointed a receiver to sell commercial realty owned by the husband. That realty was subject to a mortgage securing a $300,000 debt that was not in default. The loan contract permitted partial prepayment, but prepayment exceeding twenty percent of the original principal amount of the loan during any successive twelve month period triggered the borrower's obligation to pay a fee equal to six months' interest at the loan rate on the amount by which the prepayment exceeded the twenty percent limitation. In *Lazzareschi* this provision, apparently in conjunction with a "due

on sale" clause, generated a fee of $9,130.02 when the receiver sold. The fee was paid to the lender by the purchaser who then sued to recover it.

The purchaser in *Lazzareschi* argued that the fee was an invalid penalty because interest rates had risen above the loan contract rate so that the mortgagee suffered no loss of interest income by virtue of the prepayment. The court, treating the purchaser as a subrogee of the mortgagor husband, rejected the purchaser's penalty argument on the following rationale:

> "[The purchaser] cites *Freedman v. The Rector*, 37 Cal.2d 16 [230 P.2d 629], for the principle that damages imposed must bear a reasonable relationship to the injury caused. But the *Freedman* case and all of those which have been based on it are concerned with breach of a contract in some manner. In the instant case, there has been no breach. The borrower had the option, clearly spelled out in the promissory note, of making one or more prepayments. He, by the action of the receiver, availed himself of the option. This is not a situation of liquidated damages. Although the word 'penalty' is used, and perhaps properly so in that a charge is made which is equivalent to unearned interest, there is no penalty in the sense of retribution for breach of an agreement, nor is there provision for liquidated damages because of ascertaining what the damages for such breach may be. Nor is the case one in which there is forfeiture for a default.... Indeed, in the case before us there is the opposite of default, that is, a payment made before the promisor was obligated to make it."

22 Cal.App.3d at 307, 99 Cal.Rptr. at 420.

Carlyle's initial assault on the logic that performance is not breach is encapsulated in two sentences from its brief in chief. "[T]he legal principle [is] that, in the absence of a clause permitting prepayment, prepayment has traditionally been regarded as a breach of the loan agreement." Brief of Appellant at 15. "It follows that where ... a note contains a clause which, instead of freely permitting prepayment, pro-

vides for a 'fee' or 'premium' in the event of prepayment, the legal effect of that fee provision is to specify a sum as liquidated damages for the breach by prepayment." *Id.* We have serious reservations concerning the validity of the premise. In any event, we deny that the conclusion applies here.

The only authority that Carlyle cites for the proposition that any prepayment is a breach of contract, absent a prepayment provision, is *In re A.J. Lane & Co.*, 113 B.R. 821, 827 (Bankr.D.Mass.1990). *Lane* states that prepayment has been regarded as a breach "since the decisions in *Abbe v. Goodwin*, 7 Conn. 377 (1829) and *Brown v. Cole*, 14 L.J.–Ch. 167[, 14 Simons' Reports 427] (1845)." *Id.* The cases are early recognitions of the rule of perfect tender, but neither illustrates a "breach" by prepayment. *Brown v. Cole* reports the sustaining of a demurrer to a bill to decree redemption of mortgaged property, where the mortgagor had tendered prepayment, but the mortgagee refused to accept the money and would not execute a deed of reconveyance. 14 Simons' Reports at 427. The court would not order redemption before the day appointed for that purpose had arrived. *Id.* at 428.

*Abbe v. Goodwin* was cited by this Court in *Promenade Towers*, 324 Md. at 594, 597 A.2d at 1380, as one among many cases denying a right to prepay absent statute or contract so providing. In *Abbe* the lender refused tendered prepayment, prompting the borrower to seek an order of redemption. The court dismissed the bill with a ringing endorsement of freedom of contract, as follows:

"Has the plaintiff any merits? What is the object of this bill? It is to compel the defendant to accept his money before it is due, and relinquish his security. In other words, it is to substitute another contract for that which the parties have entered into. It will be in vain to search for authorities to that effect. None are shewn. It is opposed to the whole doctrine of contracts.... It is surely too bald to insist, that the obligor, by his own act, may discharge the contract before it is due. We might next expect to be pressed, on some real or imaginary equity, to enforce the payment of money before it is due, or to permit an obligor

to be discharged upon the payment of fifty *per cent.* of the sum due."

7 Conn. at 384.

Absent any statutory or express contractual obligation compelling the lender to accept a prepayment, the borrower's tender of prepayment would seem to be simply an offer to modify the operation of the rule of perfect tender that would be incorporated by common law in the loan contract. Such an offer is not a breach of the contract, even if the offer is rejected. If the offer is accepted, the lender may well be viewed to have modified the contract, or to have waived the common law right to refuse prepayment. Where, on the other hand, the loan contract obliges the lender to accept a prepayment under circumstances with which the borrower has complied, conventional contract law would view the borrower as having performed the contract and not as having breached it.

Carlyle, having labeled all prepayments as breaches, concludes that, where the prepayment is not "freely" permitted, a provision for a prepayment fee is a provision for liquidated damages. In Carlyle's Orwellian lexicon, just as performance is breach, a "freely" permitted prepayment is an unconditional right to compel the lender to accept prepayment. This argument completely inverts the holding in *Promenade Towers.* No such right is implied into a mortgage loan agreement by operation of the common law. *Id.* No statute requires that result in this transaction. Thus, § 9.1 of the note in this case altered the common law rule, imposed an obligation on AIG to accept a contract-conforming prepayment, and gave Carlyle an option to prepay, which it exercised.

For legal authority Carlyle's principal reliance is on *Lane,* 113 B.R. 821.[3] *Lane* applies § 506(b) of the Bankruptcy Code,

---

**3.** *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Calif.1987), also cited by Carlyle, is another case in which a bankruptcy court disallowed a lender's claim for a prepayment fee. As in *Lane,* the court held the provision to be invalid under liquidated damages standards based on a determination that the prepayment formula was not a reasonable estimate of the lender's damages. *Id.* at 504–06. The court did not

11 U.S.C. § 506(b). Under § 506(b) an oversecured creditor is allowed interest and reasonable charges provided for under the agreement that gave rise to the claim. *Lane* holds that the reasonableness of these charges is exclusively a question of federal law and, applying federal law, concluded that a prepayment fee involved there was unreasonable. 113 B.R. at 825, 830. In that context the *Lane* court discussed prepayment charges as liquidated damages.

After announcing that prepayment is regarded as a breach of contract, when not expressly permitted, the *Lane* court said:

"The prepayment charge ... is a natural result of treating prepayment as a breach, and the charge should be considered in that light. When so considered, it is clear that the charge is a liquidated damage provision inserted to compensate the lender for the breach of early payment, and is not part of an alternative performance.

"Under a true alternative contract, performance does not, of itself, constitute a breach of the other alternative promise. Yet that is what prepayment constitutes. An alternative contract, moreover, is one in which either alternative is equally open to the promissor. 5 W. Jaeger, *Williston on Contracts* § 781 (3d ed. 1961). When these notes were signed, prepayment was not as equally open to the Debtor as was payment over time; if it were, the Debtor would not have borrowed the money."

113 B.R. at 827.

*Lane* highlights that, under AIG's analysis of the loan contract, the borrower may perform the promise to repay in alternative manners. Carlyle could perform either by paying in installments throughout the specified term or by choosing to prepay the remaining principal and interest due, along with

---

explain why a liquidated damages analysis was proper; rather, the court conceded that the classification of the prepayment provision as a liquidated damages provision was "not altogether certain," and that the classification was based at least partly on the fact that the parties agreed to that characterization. *Id.* at 503.

the agreed fee. We cannot agree, however, with *Lane*'s greatly oversimplified test for true alternative performances in the context of commercial loan repayments. The availability to the borrower of an option to prepay may be viewed as a benefit to a solvent borrower, and the provision does not fail simply because the possibility of the borrower's actually exercising the option may seem remote at the time ·the loan is made.

Restatement (Second) of Contracts § 356 deals with liquidated damages and penalties. Comment c of § 356 states in relevant part:

> "*c. Disguised penalties.* ... Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract.... Although the parties may in good faith contract for alternative performances ..., a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section. In determining whether a contract is one for alternative performances, the value of the alternatives may be decisive."

Addressing the same subject, Williston observes:

> "The fact that a promise is expressed in the alternative, however, may easily be given too much weight. As the question of liquidated damages or penalty is based on equitable principles, it cannot depend on the form of the transaction, but rather on its substance. It follows that a contract expressed to be in the alternative when examined in the light of the existing facts may prove to be:
>
> (1) A contract contemplating a single definite performance with a penalty stated as an alternative;
>
> (2) a contract contemplating a single definite performance with a sum named as liquidated damages as an alternative, or

(3) a contract by which either alternative may prove the more advantageous and is as open to the promisor as the other."

5 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 781 (3d ed. 1961). According to Williston, an agreement offers what is in substance an alternative performance when

"on a true interpretation it appears that it was intended to give a real option, that is, that it was conceived possible that at the time fixed for performance, either alternative might prove the more desirable."

*Id.*

We need not decide in this case whether the foregoing rules apply to prepayment provisions where there has been a breach of the loan contract by the borrower, *e.g.*, a default by failure to pay as agreed or by invoking the protection of bankruptcy, so that the lender accelerates the principal balance. Here, assuming that the question of alternative performance versus liquidated damages is even relevant when there has been no breach, the answer to the question is self-evident. While current in all of its obligations, Carlyle voluntarily prepaid. This is not a case in which prepayment was merely conceivably possible when the contract was formed. Carlyle demonstrated by its conduct that alternative performance by prepayment became "more desirable." Williston § 781.

In its reply brief Carlyle seeks to justify categorizing § 9.1 of the note as a liquidated damages provision by applying law and economics jurisprudence. Carlyle borrows part of the analysis (but not the conclusion) from D. Whitman, *Mortgage Prepayment Clauses: An Economic and Legal Analysis*, 40 UCLA L.Rev. 851 (1993). In a subsection headed, *"The Economics of Prepayment Fees,"* Professor Whitman says:

"Essentially, prepayment fees are nothing more than liquidated damages clauses. The lender has committed itself to leave its funds outstanding for a fixed period at a given interest yield, and to suffer the market rate risk inherent in this position. If rates rise after the loan has

been made, the value of the loan to the lender will fall accordingly. This risk is inherent in the role of a fixed-interest lender, and it is only partially mitigated by the inclusion of a due-on-sale clause. In return for absorbing the risk of rising rates, the lender wants 'call protection': some assurance that if market rates fall, the borrower will not merely prepay the loan and refinance at a lower rate. From the lender's viewpoint, a prepayment is a derogation of the right to earn the agreed yield for the full term even if extrinsic rates drop. In other words, the borrower breaches its obligation to keep the loan in effect for its full term."

*Id.* at 871–72 (footnote omitted).

Professor Whitman points to two "facts" in the prepayment context which

"lead inexorably toward [the] conclusion [that alternative performances are not involved]: first, it is payment on time, rather than early payment with a fee, that the lender primarily desires and for which the lender bargains; and second, prepayment may cause the lender substantial damage, and the fee's obvious purpose is to compensate for that damage. A prepayment is simply a breach of the borrower's primary promise—to pay the loan on schedule—and a court ought not permit the drafter of the documents to disguise that fact."

*Id.* at 889–90. This analysis treats an economic objective as a covenant, a failure to reach that objective as a breach of contract, and the shortfall from that objective as damages for breach of contract.[4]

Nevertheless, Professor Whitman concludes that the type of prepayment clause that Carlyle says is involved here should

---

4. This is not to say that, in the event of an act of default, as defined in a loan contract, by a borrower coupled with an acceleration of the maturity of the principal balance by the lender and with the lender's demand for a prepayment fee provided for in the contract, it would be inappropriate to analyze the prepayment fee provision under the rules applicable to liquidated damages provisions in order to determine whether a penalty was being imposed. That analysis will await a case presenting those facts.

be sustained by courts because it promotes economic efficiency. *Id.* at 903. More specifically, with respect to a voluntary prepayment by a borrower who is current on its loan obligations, Professor Whitman's thesis is that

> "no matter how great the apparent overcompensation that the clause gives the lender, the practical amount of overcompensation in any voluntary prepayment case will be limited to some portion of present value of the borrower's opportunity to refinance at a below-market rate."

*Id.* at 904. The above quote, expressed in the language of law and economics, applies Williston's conceivably more desirable alternative test to uphold any voluntary prepayment.

In the case at hand Carlyle would have us give an economic interpretation to the loan contract in order to pronounce the prepayment clause a liquidated damages clause, but then Carlyle would have us apply traditional liquidated damages law to that interpretation, without regard to efficiency. We shall do neither.

We have matched the contract against the facts and find no breach. Absent any breach by the borrower, there is no occasion to consider damages or to look for a liquidated damages clause in disguise, much less to alter the contract to accord with a theory of a lender's primary economic desires. "We do not think the situation here calls for a result which would defeat valuable contractual rights of the [lender]." *Pierson v. Pyles,* 234 Md. 119, 124, 197 A.2d 890, 893 (1964) (refusing to permit prepayment of land installment contract and acceleration of time for delivery of deed).

Further, there are policy reasons for not analyzing a prepayment provision as a liquidated damages clause, absent a breach. Commercial mortgage lenders invest the savings of many individuals. These lenders ordinarily should be able to predict the legal result that language employed by them in their loan contracts will achieve. No universal principle unifies the legal and economic analysis of all transactions, and the legal form selected for a transaction may control, despite its economic equivalency with some other form of transaction.

See, e.g., *Attorney General v. Equitable Trust Co.*, 294 Md. 385, 450 A.2d 1273 (1982) (rejecting theory of "credit centrality" that would have homogenized all forms of consumer credit transactions and permitted a national bank, under the most-favored lender provisions of the National Bank Act, to charge the highest rate of finance charge, in terms applicable to but one form of consumer credit transaction, in all types of transactions, without regard to form); *Falcone v. Palmer Ford*, 242 Md. 487, 496, 219 A.2d 808, 812 (1966) ("[A]n actual installment sale, at a price which is both greater than the cash price and in excess of the legal rate of interest on the cash price, is not subject to the usury laws because it is not a loan of money but a sale. . . ."); F. Kaufman, *The Maryland Ground Rent—Mysterious But Beneficial*, 5 Md.L.Rev. 1, 47 (1940) ("A redeemable ground rent is in effect a mortgage without a due date—a mortgage whose principal need never be paid—with an option in favor of the 'mortgagor' to pay it off at any time after the expiration of five years at a capitalization of six per cent.").

Finally, at oral argument, Carlyle denied that its object was to avoid any prepayment fee whatsoever. Carlyle submitted that, if this Court opines that § 9.1 of the prepaid note is void as a liquidated damages clause that imposes a penalty, Carlyle would nevertheless be obliged to pay actual damages, for example, the difference between the present value of the yield on the loan at the contract rate less the present value of the yield on a comparable, substitute investment, presumably plus incidental damages. This final submission brings the entire argument full circle. The question immediately arises, "To support the award of actual damages to AIG, what provision of the loan contract did Carlyle breach?" The answer remains the same—"None."

In view of the foregoing, we need not answer certified question No. 3.

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH. COSTS TO BE EVENLY DIVIDED BETWEEN THE PARTIES.